DISCIPLINARY COUNSEL *v.* SQUIRE.

[Cite as *Disciplinary Counsel v. Squire,* 130 Ohio St.3d 368, 2011-Ohio-5578.]

*Attorney misconduct—Multiple violations of the Rules of Professional Conduct—*
*Indefinite license suspension.*

(No. 2010-2021—Submitted April 5, 2011—Decided November 3, 2011.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and
Discipline of the Supreme Court, No. 09-023.

_____

**Per Curiam**.

{¶ 1} Respondent, Percy Squire of Columbus, Ohio, Attorney Registration No. 0022010, was admitted to the practice of law in Ohio in 1981.

{¶ 2} On February 17, 2009, relator, Disciplinary Counsel, filed his initial complaint charging Squire with a single count of misconduct arising from his alleged mishandling of a $25,000 flat fee. The matter proceeded, however, on relator's five-count second amended complaint, which charged Squire with multiple violations of the Rules of Professional Conduct based upon allegations that he misappropriated and mishandled client funds, failed to maintain adequate records documenting client funds entrusted to him, and engaged in business relationships with clients without notifying them of the conflicts of interest inherent in those relationships.

{¶ 3} The parties submitted certain stipulations of fact and misconduct and more than 70 stipulated exhibits. The remaining issues were tried to a panel of the Board of Commissioners on Grievances and Discipline. In its report, which was not unanimous, the panel made findings of fact, determined that Squire had committed 12 violations of the Rules of Professional Conduct, recommended that 13 alleged violations be dismissed for lack of sufficient evidence, and

recommended that Squire be suspended from the practice of law for two years with one year stayed on conditions. The board adopted the panel's report without qualification.

{¶ 4} Relator objects to the board's findings with respect to count three of the complaint, which addresses a loan Squire obtained from his friend, Bishop Norman Wagner, and funds received for Squire's client Mark D. Lay, as well as the recommended sanction. He argues that the evidence with respect to count three clearly and convincingly demonstrates that Squire converted or misappropriated client funds and that we should therefore indefinitely suspend Squire from the practice of law.

{¶ 5} Having carefully considered the arguments of the parties and the evidence presented in this case, we sustain relator's objections in part and overrule them in part and indefinitely suspend Squire from the practice of law in Ohio.

**Misconduct**

**Count One**

{¶ 6} On Friday, December 7, 2007, Mike Riley retained Squire to represent him and his father in various pending legal matters and signed an engagement letter agreeing to pay a flat fee of $100,000 in installments by February 15, 2008. Riley gave Squire $5,000 in cash so that he would begin working immediately, with the understanding that when Squire received the first $25,000 installment, he would send $5,000 to Riley's son.

{¶ 7} Later that day, the first $25,000 installment was wired into Squire's business account. Squire did not deposit the $5,000 cash into his client trust account or his business account, but instead spent it on undisclosed personal matters over the weekend. He did, however, write a $5,000 check from his business account payable to Riley's son as he had promised.

2

{¶ 8} The following Monday morning, December 10, 2007, Riley informed Squire that his legal services were no longer required. He asked Squire to deduct his earned fees and return the balance of the $25,000 payment. Squire, however, informed Riley that he was unable to return the $25,000 because he had already spent it. Squire gave Riley a promissory note from Percy Squire, L.L.C., promising to return the entire $25,000 plus interest by January 10, 2008. Squire failed to timely pay on the note, and when Riley visited his office on March 11, 2008, Squire issued a $25,000 check, postdated to March 12. Riley attempted to cash the check immediately, but it was rejected for insufficient funds. Later that day, Squire gave Riley a cashier's check for $25,000.

{¶ 9} Based upon these facts, the board found that Squire had violated Prof.Cond.R. 1.15(a) (requiring a lawyer to hold property of clients separate from the lawyer's own property), 1.15(c) (requiring a lawyer to deposit into a client trust account legal fees and expenses that have been paid in advance and to withdraw them only as fees are earned or expenses incurred), 1.16(e) (requiring a lawyer to promptly refund any unearned fee upon the lawyer's withdrawal from employment), and 8.4(h) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law).

{¶ 10} The board recommends that we dismiss an alleged violation of Prof.Cond.R. 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), concluding that banking records demonstrating a balance of approximately $5,000 in Squire's operating account did not render his professed inability to refund Riley's $25,000 dishonest. The board further recommends that we dismiss alleged violations of Prof.Cond.R. 1.7(a)(2) (providing that a lawyer's continued representation of a client creates a conflict of interest if there is a substantial risk that the lawyer's ability to represent the client will be materially limited by the lawyer's responsibilities to another client, former client, or third person or by the lawyer's own personal interests),

1.7(b)(2) (requiring a lawyer to obtain informed consent in writing from each affected client before accepting or continuing representation of a client whose interests conflict with his own), and 1.8(a) (prohibiting a lawyer from entering into a business transaction with a client unless the client is advised in writing of the desirability of obtaining independent legal counsel and the terms of the transaction are fair, reasonable, and fully disclosed in a writing signed by the client), observing that Riley had terminated Squire's representation before Squire had issued the promissory note to secure his refund and before Squire took affirmative action to seek Riley's assistance in obtaining financing for an unrelated business venture.

{¶ 11} We adopt these findings of fact, which are supported by the record and clearly and convincingly demonstrate that Squire violated Prof.Cond.R. 1.15(a), 1.15(c), 1.16(e), and 8.4(h). Because we find that the alleged violations of Prof.Cond. R. 1.7(a)(2), 1.7(b)(2), 1.8(a), and 8.4(c) are not supported by clear and convincing evidence, they are hereby dismissed.

### Count Two

{¶ 12} Squire had engaged in business dealings with Curtis Jewell for 15 years. Jewell was also Squire's client. On March 12, 2008, Squire borrowed $30,000 from Jewell in order to refund the $25,000 discussed in Count One to Riley. He executed a promissory note to pay "to the order of Curtis Jewell the sum of Thirty Thousand Five Hundred Dollars ($30,000) [sic] on or before March 18, 2008," and stating that any holder could declare the "entire debt due and owing if the payment of $30,000 [sic] is not paid on or before March 18, 2008, or whatever sum is due and owing at the time of payment." The note further provided, "Overdue installations of interest and principal shall bear interest at the rate of 12% per annum payable immediately. In addition, overdue penalties will accrue at a rate of 18% commencing March 19, 2008."

4

{¶ 13} Squire stipulated that he did not advise the client in writing that he should seek the advice of independent counsel, nor did he obtain the client's informed consent in writing to the essential terms of the transaction and Squire's role in the transaction, and he did not disclose whether he was representing the client in the transaction. On March 17, 2008, Squire wired $31,500 from his client trust account to Jewell as payment on the note.

{¶ 14} In his June 2009 answer to an interrogatory in which relator sought information regarding the source of the funds Squire had used to pay his debt to Riley, Squire stated that he had obtained $25,000 from Jewell and that he had repaid Jewell the following week with funds he had borrowed from his friend, Bishop Norman Wagner. When asked to identify the terms of the loan "as they were explained to Mr. Jewell," Squire replied, "Percy Squire Co. LLC, would borrow $25,000.00 for one or two days," but he did not disclose the existence of the promissory note. Then, in October 2009, Squire disclosed the promissory note and advised relator that he had borrowed $28,500 from Jewell and that the remaining $3,000 represented interest on those funds.

{¶ 15} Based upon these facts, the board found that Squire had violated Prof.Cond.R. 1.8(a) and recommended that we dismiss an alleged violation of Prof.Cond.R. 8.4(h). We adopt the board's findings of fact, misconduct, and violation of Prof.Cond.R. 1.8(a) and hereby dismiss the alleged violation of Prof.Cond.R. 8.4(h).

### Count Three

#### The Bishop Wagner Loan

{¶ 16} Squire borrowed $100,000 from Bishop Norman Wagner, who had borrowed the money from Huntington National Bank. On March 17, 2008, the money was wired to Squire's client trust account, and Squire signed a promissory note and an indemnification agreement as the sole member of Percy Squire Co., L.L.C. In those documents, he promised to repay $75,000 on or before March 19,

2009, to pay Wagner for all of the interest payments on the Huntington loan, and to indemnify and hold Wagner harmless in the event of a default on the Huntington loan.

{¶ 17} Squire also executed a security agreement that granted Wagner a security interest in "[a]ll accounts, contract rights, instruments, documents, chattel paper, and all obligations in any form arising out of the sale or lease of goods or rendition of services by [Percy Squire Co., L.L.C.]" and "[a]ll general intangibles, chooses [sic] in action, causes of action, obligations or indebtedness owed to [Percy Squire Co., L.L.C.] from any source whatsoever, and all other intangible personal property of every kind and nature." The security agreement further gave Wagner the right "to verify the validity, amount, or any other matter relating to any Accounts * * * and after default by [Percy Squire Co., L.L.C.] hereunder collect the same directly," and "to notify post office authorities to change the address for delivery of [Percy Squire Co., L.L.C.'s] mail to an address designated by [Wagner], to receive and open all mail addressed to [Percy Squire Co., L.L.C.] and to retain all mail relating to Collateral and forward all other mail to [Percy Squire Co., L.L.C.]." [1] Relator has not submitted any evidence tending to show that Wagner or his heirs have exercised these rights or that any client confidences have been disclosed to them.

{¶ 18} From March 17, 2008, when proceeds of the Huntington Loan were wired to Squire's client trust account, through April 21, 2008, Squire made 19 withdrawals from his client trust account—all for his personal or business expenses. He also received two deposits, totaling $17,500, both of which, Squire testified, represented fees for legal representation.

---

1. Squire entered into a similar financial arrangement with another attorney, Charles Freiburger, that contained these same provisions. However, Squire has not been charged with any misconduct arising from his business dealings with Freiburger.

{¶ 19} In response to relator's inquiries regarding the loan from Wagner, Squire initially stated that he had received $75,000 from Wagner. Upon further inquiry, he admitted that he had received $100,000, but claimed that the $25,000 that was not included in the promissory note represented payment for work he had performed in a wrongful-death case filed on behalf of the estate of Wagner's nephew, brother of Brian and Kim Wallace (discussed more fully in Count Four, below). But when relator reminded Squire that he had taken the wrongful-death case on a contingent-fee basis, which would render the $25,000 payment clearly excessive, Squire claimed that his prior statement had been erroneous. At his deposition, he testified that he had made a mistake in excluding the $25,000 from the promissory note, because he and Wagner had contemplated that he would use the remaining $25,000 to repay Riley. Although Squire testified that his responses were based on an honest mistake of memory, rather than an intentional misrepresentation, the board did not find this testimony credible. At the time of the hearing, Squire had not repaid Wagner, his widow, or his estate the principal due on the note.

{¶ 20} Based upon this conduct, we find that Squire violated Prof.Cond.R. 1.15(a) (requiring a lawyer to hold property of clients separate from the lawyer's own property and to maintain detailed records documenting the funds received, disbursements made, and current balance in the account), 1.15(c), 8.1(a) (prohibiting knowingly making a false statement of material fact in connection with a disciplinary matter), 8.4(c), and 8.4(h).

{¶ 21} Although the board implies that *Disciplinary Counsel v. Shaver*, 121 Ohio St.3d 393, 2009-Ohio-1385, 904 N.E.2d 883, stands for the proposition that a violation of Prof.Cond.R. 1.6(a) does not require an actual disclosure of confidential client information, it nonetheless recommends that we dismiss an alleged violation of that rule, as well as alleged violations of Prof.Cond.R. 1.7(a) (prohibiting a lawyer from accepting or continuing a client's representation if that

representation will be directly adverse to another client or there is a substantial risk that the lawyer's ability to carry out the representation will be materially limited by the lawyer's responsibilities to another client, a third person, or the lawyer's own personal interests) and 1.7(b) (prohibiting a lawyer from accepting or continuing the representation of a client if such representation would create a conflict of interest, unless the lawyer would be able to provide competent, diligent representation to each affected client, each affected client gives informed consent in writing, and the representation is not prohibited by law and would not involve the assertion of a claim by one client against another in the same proceeding).

{¶ 22} Relator has not objected to this recommendation, and in the absence of full argument and briefing of these issues, we adopt the board's recommendation and dismiss the alleged violations of Prof.Cond.R. 1.6, 1.7(a), and 1.7(b). Our dismissal of these allegations, however, should not be construed as this court's approval of financing or security arrangements involving an attorney's accounts receivable.

The Lay Matter

{¶ 23} Squire was one of two attorneys who represented Mark D. Lay in a criminal matter involving federal charges of mail fraud, wire fraud, and investment-advisor fraud. Squire also represented Lay in several civil matters arising from his criminal conduct and assisted in the appeal of his federal conviction. While Squire represented Lay in these matters, he received certain funds on Lay's behalf. The remaining charges in Count Three relate to his handling of those funds.

*$113,228.18 Lay Insurance Proceeds*

{¶ 24} On April 24, 2008, the law firm Shearman & Sterling, L.L.P., wired $113,228.18 on behalf of Squire's client, Mark Lay, to Squire's trust account. The money represented insurance proceeds. Lay went to prison in July 2008 after his felony fraud convictions, but he was free at the time of this transfer.

{¶ 25} After receiving the deposit, Squire began writing checks, many of which went to cover his own expenses. Squire stated that he transferred $20,000 of the $113,228.18 to his operating account for services rendered for Lay in a number of legal matters, including his representation in Lay's criminal case. That statement was contrary to his later testimony that he had been paid in full for his representation of Lay in his criminal matter by the end of 2007. Despite relator's requests, Squire has failed to produce any billing records or fee agreements regarding Lay's remaining legal matters. On June 10, 2008, the balance in Squire's client trust account was $193.61, but even his own post hoc accounting effort reveals that the account should have held at least $5,330.65 of the Lay insurance proceeds on that date, not to mention the $20,000 that respondent claimed as attorney fees or $10,600 in checks made payable to Wesley Walker, whom Squire identified as his courier.

{¶ 26} Squire testified that every dollar of the $113,228.18 he spent was discussed with Mark Lay and approved by Antoine Smalls, the former vice president of operations for Lay's company, MDL Capital Management. Lay, however, testified that he had no recollection of the $113,228.18. Smalls testified that he was not involved in authorizing payments on Lay's behalf until he established the Mark D. Lay Legal Defense and Welfare Fund ("Lay defense fund") after Lay went to prison—more than two months after Squire received the $113, 228.18 and began spending it. Although relator obtained the bank records for Squire's client trust account, including images of canceled checks, the only other evidence that Squire submitted to document his use of these funds was several summaries of expenditures he claims to have made on Lay's behalf.

*The Mark D. Lay Legal Defense and Welfare Fund*

{¶ 27} Squire was designated the sole trustee of the Lay defense fund at its inception in June 2008, and Smalls sent Squire $280,000 in contributions that he had received on behalf of the fund. Squire deposited those funds into his client

trust account and began issuing checks to Lay and his creditors, as well as himself, his own creditors, and Wesley Walker. It also appears that Squire paid expenses related to his representation of other clients from the defense-fund money.

{¶ 28} Deposits to Squire's client trust account during the ensuing months included client funds, personal funds, earned legal fees, the proceeds of a loan that Squire had obtained from Freiburger, and funds for the expenses in another client matter.

{¶ 29} The board further observed that Squire's bank records reveal scores of checks made payable to his courier, some of which identified a client name on the memo portion and some of which did not. Squire testified that his courier would follow his instructions, which usually involved cashing the checks and returning the money to Squire, who stated that he would then use the cash to pay client expenses, himself, and his own creditors. Squire, however, produced no receipts or other documentation to prove that client expenses had been paid in that manner, and the courier was not called to testify at the hearing.

{¶ 30} With the exception of a $150,000 flat fee that Squire and another attorney had charged Lay for representing him in his criminal trial, Squire did not have any agreement with Lay regarding the fee for his services. Instead, they each understood that Squire's fee would be determined and paid at a later date. Squire did not send any billing statements or accounting of his time to Lay. Yet Squire testified that he was "borrowing" from the funds he held for Lay's benefit in an amount that he believed to represent the fees he had earned in working for him. He testified that Lay or Smalls authorized him to make the transfers from his client trust account and that he repaid those loans with money he borrowed from others, including Freiburger.

{¶ 31} Lay testified that although the trust money was to be used for his defense and to support his children, it did not belong to him and, therefore, he did

not direct any of its use. He did not recall giving Squire any instructions regarding the use of the funds. Smalls recalled having some discussions with Squire from June 2008 until Squire designated him as the sole trustee of the fund in October 2008, and he knew that Squire was taking loans from the funds held in trust for Lay.

{¶ 32} With respect to the Lay matter, the board found that Squire had violated Prof.Cond.R. 1.5(b) (requiring an attorney to communicate the nature and scope of the representation and the basis or rate of the fee and expenses within a reasonable time after commencing the representation unless the lawyer regularly represented the client and will charge the client on the same basis as previously charged), 1.15(a) (requiring a lawyer to hold property of clients separate from the lawyer's own property and to maintain detailed records documenting the funds received, disbursements made, and current balance in the account), 1.15(c), 8.4(c), and 8.4(h). We adopt these findings.

*Relator's Objection*

{¶ 33} Relator objects to the board's findings of fact regarding the Lay matter. He contends that Squire bears the burden of establishing how the funds held in his client trust account were spent. Because Squire failed to maintain both records of the funds held in his client trust account and documentation to corroborate claimed expenditures from that account, relator argues that the evidence leads to the inevitable conclusion that Squire converted client funds to his own use.

{¶ 34} In attorney disciplinary proceedings, relator bears the burden of proving, by clear and convincing evidence, the facts necessary to establish a violation of a Disciplinary Rule. *Disciplinary Counsel v. Jackson* (1998), 81 Ohio St.3d 308, 310, 691 N.E.2d 262: Gov.Bar R. V(6)(J). "Clear and convincing evidence" is " 'more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt"

11

in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " *Ohio State Bar Assn. v. Reid* (1999), 85 Ohio St.3d 327, 331, 708 N.E.2d 193, quoting *Cross v. Ledford* (1954), 161 Ohio St. 469, 53 O.O. 361, 120 N.E.2d 118, paragraph three of the syllabus.

{¶ 35} With respect to Count Three, we find that Squire flagrantly violated the Rules of Professional Conduct that require attorneys to hold client property separate from their own property and to maintain detailed records of the money held and disbursed on behalf of those clients. He deposited his own funds, including money he borrowed from his friends and clients, into his client trust account and used that account to pay his business and personal expenses.

{¶ 36} Squire also failed to maintain or produce documentation of client-related expenditures. He admittedly obtained significant amounts of cash from his client trust account for the ostensible purpose of paying client expenses, but has failed to produce a single bill or receipt to substantiate his testimony that the funds were used for client purposes. Indeed, the most detailed records that he appears to have maintained or produced with regard to client expenses are the images of the canceled checks, a number of which are payable to Squire or his courier and a number of which do not even refer to a client name on the memo line. The evidence also clearly and convincingly demonstrates that Squire failed to discuss the basis or rate for legal services provided after Lay's criminal trial, which he had completed on a flat-fee basis.

{¶ 37} We also find that Squire engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation by knowingly making false statements of material fact during the course of the disciplinary investigation. Squire falsely characterized his $100,000 loan from Bishop Wagner as a $75,000 loan and a $25,000 payment on a wrongful-death action that he had undertaken on behalf of certain members of Bishop Wagner's family (the Wallace wrongful-death action),

only to change his story when relator informed him that such a fee was clearly excessive in light of his agreement to handle that matter on a contingent-fee basis.

{¶ 38} We find that Squire also gave conflicting accounts regarding his use of the Lay funds. In a December 19, 2008 letter from Squire to Smalls, Squire stated that he had not collected any fees in the Lay representation. Contrary to that representation, Squire later informed relator that the Lay funds he had used for the benefit of himself and his other clients represented earned fees. But at the time he used the funds, he had not discussed his fee arrangement with Lay and had no records documenting the time that he had devoted or the tasks that he had performed on Lay's behalf. At his disciplinary hearing, Squire testified that he had borrowed funds from the insurance proceeds and the Lay defense fund with the knowledge and consent of Lay and Smalls.

{¶ 39} Relator argues that because the Rules of Professional Conduct require attorneys to maintain written records of client funds that have been entrusted to them and to document all expenditures of those funds, Squire's verbal representations about his expenditures are not credible. Although the board made no express finding that Squire had misappropriated or converted client funds,[2] relator contends that the evidence leads to the inevitable conclusion that Squire did just that.

{¶ 40} "[C]onversion is the wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." *Joyce v. Gen. Motors Corp.* (1990), 49 Ohio St.3d 93, 96, 551 N.E.2d 172. And misappropriation is "[t]he application of another's property or money dishonestly to one's own use." Black's Law Dictionary (9th Ed.2009) 1088. See also *Columbus Bar Assn. v. Kiesling*, 125 Ohio St.3d 36, 2010-Ohio-1555, 925 N.E.2d 970, ¶ 22, 26-28, 30-32, 46

---

2. The closest that the board comes to making such a finding is to state, "Relator also characterizes Count 3 as demonstrating that Squire converted clients' funds for his own use."

(disbarring an attorney who had misappropriated funds by borrowing money held on behalf of a client without the client's consent and by leading clients to believe, falsely, that he had properly held and disbursed their funds to the proper taxing authorities, when he had retained the funds and used them for his own benefit). Therefore, we must determine whether relator has proven by clear and convincing evidence that Squire's use of the Lay insurance proceeds or defense funds was dishonest or wrongful.

{¶ 41} Lay testified that with the exception of the $150,000 flat-fee contract he had with Squire and another attorney to represent him in his criminal matter, he and Squire did not discuss Squire's fees for his representation, agreeing to deal with that issue at a later date. He could not recall whether Squire had submitted any bills for his work or whether he had paid him for his work. He indicated that if he had received bills from Squire, he may have forwarded them to his home.

{¶ 42} Despite Squire's testimony that every dollar of the $113,228.18 he spent was discussed with Lay, Lay testified that he had no knowledge of Squire's receipt of $113,228.18 on his behalf in April 2008, before his sentencing. Nor could he recall instructing Squire what to do with those funds. And when asked whether he understood that Squire would pay his own legal fees out of the money Squire held for Lay, Lay testified, "I mean, I can't really answer that question because he was doing—he's done a lot for me, and we didn't have a formal arrangement to say to do this or that, so I can't answer that really."

{¶ 43} At his deposition, Lay reviewed the checks that Squire had issued from his trust account after receiving Lay's $113,228.18 deposit, but Lay did not have any idea why Squire had written those checks. Although he recognized his own handwriting on the back of an $8,000 check payable to him, Lay did not recall receiving the check. He denied having any knowledge or information about

relator's allegation that Squire had spent about $30,000 of the $113,228.18 for his own purposes.

{¶ 44} Lay also recognized his own handwriting on a check written to one of his friends on July 2, 2008, but did not recall whether he had instructed Squire to issue that check. He testified, "I had a trust with [Squire]. * * * I don't recall having a direct conversation with [Squire] because I really wasn't controlling any money." By the time that check was written, the Lay defense fund had been in existence for approximately two weeks, and Lay acknowledged that the payment to his friend could have been made at Smalls's direction. Lay further testified that Squire and Smalls "kept [him] informed and [he] had conversations with them [about expenditures]."

{¶ 45} When relator asserted that Squire had used about $70,000 of the $280,000 defense fund for his own purposes, Lay stated that he was not in control of those funds and had no recollection of whether those expenditures were authorized. While acknowledging that in "[his] current situation every dime means a lot to [him]," Lay expressed little concern about the missing funds.[3]

---

3. {¶ a} Attached to Squire's answer brief are three exhibits that are not part of the record transmitted to this court by the board. Relator has moved to strike those exhibits, observing that they were either not admitted at the hearing or were never offered into evidence and that the panel had struck them from the record after Squire submitted them with his written summation.

{¶ b} We have recognized that Gov.Bar R. V provides for a formal evidentiary hearing before a panel of the board and does not provide for the introduction of additional evidence once the proceedings are before this court. Therefore, we have stated that we will accept additional evidence at this late stage of the proceedings only under the most exceptional of circumstances. *Columbus Bar Assn. v. Sterner* (1996), 77 Ohio St.3d 164, 167-168, 672 N.E.2d 633. Accord *Columbus Bar Assn. v. Finneran* (1997), 80 Ohio St.3d 428,432, 687 N.E.2d 405; *Disciplinary Counsel v. Lentes*, 120 Ohio St.3d 431, 2008-Ohio-6355, 900 N.E.2d 167, ¶ 4.

{¶ c} Squire has not demonstrated that exceptional circumstances exist. Moreover, we note that Exhibit A, a motion filed by Squire, is already in the record. Exhibit B is the purported unsworn declaration of Lay, executed pursuant to Section 1746, Title 28, U.S.Code (authorizing in federal proceedings declarations under penalty of perjury that are not sworn before a notary). But Ohio has never recognized that these unsworn declarations may serve as a substitute for a valid affidavit. See, e.g., *Toledo Bar Assn. v. Neller*, 102 Ohio St.3d 1234, 2004-Ohio-2895, 809 N.E.2d 1152, ¶ 21. Exhibit C is an uncertified, and therefore unauthenticated, photocopy of a journal entry purportedly from the Wallace wrongful-death action. Accordingly, we grant relator's motion to strike the exhibits attached to Squire's answer brief.

**{¶ 46}** As discussed above, Smalls testified that he did not have any involvement with the $113,000 in insurance proceeds that were deposited into Squire's trust account in April 2008, observing that Lay was not yet in prison and was therefore able to handle his own affairs. He stated that his involvement with Lay's finances began in June 2008, when he established Lay's defense and welfare fund. Relator questioned him about a number of disbursements that Squire had made from this fund. Smalls, a self-acknowledged "accountant by trade," testified that he may have authorized the disbursements from the Lay defense and welfare fund. He acknowledged that he had discussed Squire's attorney fees, that he may have received billing records documenting the work that Squire had performed on Lay's behalf, and that he had authorized payments to Squire. Smalls also testified that he could recall four or five times that Squire had spoken with him about borrowing money from the defense fund to pay expenses for himself or other clients, and that Squire had repaid the loans that Smalls knew about.

**{¶ 47}** Although Squire claims that his use of money from both funds was authorized, the testimony of Lay and Smalls clearly and convincingly demonstrates that his use of the insurance proceeds to pay his personal expenses and his own attorney fees was not authorized. Therefore, we conclude that respondent misappropriated funds from the $113,000 insurance proceeds by applying them dishonestly to his own use. But the equivocal testimony of Lay and Smalls with regard to the Lay defense fund leaves open the possibility that Squire's conduct with respect to that fund was, in fact, authorized. Therefore, we cannot find by clear and convincing evidence that Squire's use of the Lay defense fund was dishonest or wrongful. Nonetheless, Squire's handling of his client's funds, including his failure to maintain or provide documentation of the date, amount, payee, and purpose of each disbursement made on behalf of his clients,

his practice of having his courier negotiate checks, and his borrowing of client funds held in his attorney trust account[4] raise grave concerns.

{¶ 48} Accordingly, we sustain relator's objection with respect to the Lay insurance proceeds and overrule it with respect to the Lay defense fund and find that Squire misappropriated client funds in violation of Prof.Cond.R. 8.4(c).

**Count Four**

{¶ 49} The stipulations and evidence demonstrate that in May 2003, Bishop Wagner's nephew, Norman Wallace, was shot and killed at Case Western Reserve University. Squire represented the fiduciary of the decedent's estate on a contingent-fee basis, and in May 2006, he filed a wrongful-death action on behalf of the estate. In December 2008, the probate court removed the fiduciary and dismissed the estate when the fiduciary failed to file an account.

{¶ 50} Three attorneys who are not members of Squire's firm, as well as Squire, were counsel of record and performed legal work on behalf of the estate. Although Loc.R. 71.1(D) of the Cuyahoga County Probate Court required the fiduciary of an estate to obtain court approval before entering into contingent-fee agreements for attorney services, Squire did not apply for such approval.

{¶ 51} And despite having advised relator that he had a contingent-fee agreement in these matters, Squire explained that the $25,000 discrepancy between the $100,000 he borrowed from Bishop Wagner and the $75,000 promissory note he had issued to the bishop was attributable to attorney fees in the Wallace wrongful-death matter. But when relator advised Squire that it is clearly excessive to charge an additional flat fee in a contingent-fee case, Squire changed his story and testified that the $25,000 was part of the loan from Bishop Wagner and thus was not a fee for his services.

---

4. At the very least, such an arrangement implicates Prof.Cond.R. 1.8. Squire, however, has not been charged with a violation of that rule with regard to this conduct.

{¶ 52} Citing Squire's changing story and his failure to comply with the probate court's local rule before entering into a contingent-fee agreement, the board found that Squire had engaged in conduct that adversely reflected upon his fitness to practice law in violation of Prof.Cond.R. 8.4(h).

{¶ 53} Although Squire testified that several other attorneys worked with him on the Wallace matter and acknowledged that there was no written agreement to divide the fees, the board determined that no fees were collected or paid. The board also found that the decedent's family was generally aware of the additional legal representation and fee arrangements with the other lawyers. Therefore, the board declined to find violations of Prof.Cond.R. 1.5(a) (prohibiting a lawyer from making an agreement for, charging, or collecting an illegal or clearly excessive fee), 1.5(e) (permitting attorneys who are not in the same firm to divide fees only if the fees division is reasonable and proportional to the work performed, the client consents to the arrangement in writing after full disclosure, and a written closing statement is prepared and signed by the client and each lawyer), and 8.4(c).

{¶ 54} We adopt these findings of fact and misconduct, with the exception of the board's finding that the decedent's family was generally aware of the additional legal representation and fee arrangements with the other lawyers—a fact that has no bearing on Squire's compliance with Prof.Cond.R. 1.5(e). Because Squire did not collect or split a fee in the Wallace matter, however, we hereby dismiss the alleged violations of Prof.Cond.R. 1.5(a), 1.5(e), and 8.4(c).

## Count Five

{¶ 55} The fifth count of relator's complaint charges Squire with engaging in conduct that adversely reflects on his fitness to practice law by entering into a business transaction with a client without advising the client of the desirability of obtaining independent counsel or obtaining the client's informed consent in writing.

**{¶ 56}** The evidence demonstrated that Squire represented Patrick Prout in a civil action in the Franklin County Municipal Court from January 2007 to March 2008. During that representation, Squire borrowed money from the Prout Group, a company for which Prout served as president and CEO. Squire did not advise Prout to seek the advice of independent counsel or obtain Prout's written consent to the essential terms of, or Squire's role in, the transactions. In the absence of evidence regarding how Prout and the ownership of his company are aligned, however, the board found no violation of Prof.Cond.R. 1.8(a) or 8.4(h) and therefore recommends that we dismiss this count in its entirety. Neither party has objected to this recommendation.

**{¶ 57}** Because these alleged violations are not supported by sufficient evidence, we adopt the board's findings and dismiss Count Five of relator's complaint.

### Sanction

**{¶ 58}** When imposing sanctions for attorney misconduct, we consider relevant factors, including the ethical duties that the lawyer violated and the sanctions imposed in similar cases. *Stark Cty. Bar Assn. v. Buttacavoli*, 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16. In making a final determination, we also weigh evidence of the aggravating and mitigating factors listed in Section 10(B) of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). *Disciplinary Counsel v. Broeren,* 115 Ohio St.3d 473, 2007-Ohio-5251, 875 N.E.2d 935, ¶ 21.

**{¶ 59}** As aggravating factors, the board found that Squire had acted with a dishonest or selfish motive, had engaged in a pattern of misconduct involving multiple offenses, and submitted false evidence and false statements or had engaged in other deceptive practices during the disciplinary proceeding. See BCGD Proc.Reg. 10(B)(1)(b),(c), (d), and (f).

{¶ 60} The board also found that Squire refused to acknowledge the wrongful nature of his conduct by insisting that his misconduct has involved only his failure to maintain adequate records of the funds in his client trust account. Contrary to Squire's claims, the board expressed its concern that his conduct involved, among other things, "an extensive scheme of commingling, borrowing of client funds for himself and for other clients, borrowing against expected billing, lack of full disclosure to clients about use of their funds and of conflict of interests." See BCGD Proc.Reg. 10(B)(1)(g).

{¶ 61} Although the board acknowledged that with the exception of Mike Riley, Squire had received no complaints from his clients, who appeared to support him, it also observed that his failure to maintain adequate records may have concealed any actual harm. Therefore, the board also considered the vulnerability of and potential harm to Squire's clients. See BCGD Proc.Reg. 10(B)(1)(h). And noting that it is impossible to determine whether Lay and other clients are owed money because of Squire's lack of proper recordkeeping, the board found that Squire's failure to make restitution was another aggravating factor. See BCGD Proc.Reg. 10(B)(1)(i).

{¶ 62} In mitigation, the board found that Squire lacked a prior disciplinary record and presented evidence of his good character and reputation, including his graduation from West Point and his status as a retired Army officer. See BCGD Proc.Reg. 10(B)(2)(a) and (e). Brian and Kim Wallace testified that they had no complaints about Squire's handling of their late brother's estate. Retired federal judge Thomas D. Lambros also testified "with obvious affection and high praise" for Squire, who had served as his law clerk for two years.

{¶ 63} The board declined to find that Squire had misappropriated or converted client funds. It therefore recommends that we suspend Squire's license to practice law for two years, with 12 months stayed on the conditions that Squire (1) account to Mark Lay and any related party in interest for all funds contributed

20

to and spent from Mark Lay's insurance proceeds and defense fund during Squire's involvement, including documenting fees, loans, and expenses, (2) pay restitution to the funds of any undocumented fees, loans, or expenses, with interest at the statutory rate, (3) serve probation pursuant to Gov.Bar R. V(9) during the stayed portion of his suspension and establish an office accounting system to accurately track receipts and disbursements of client funds, fees, loans, and expenses, and (4) pay the costs of this proceeding. Relator objects to the board's conclusion that there was no misappropriation and its recommended sanction, observing that permanent disbarment is the presumptive sanction for misappropriation. See, e.g., *Cuyahoga Cty. Bar Assn. v. Churilla* (1997), 78 Ohio St.3d 348, 350, 678 N.E.2d 515. He argues, however, that an indefinite suspension is the appropriate sanction for Squire's misconduct, citing *Akron Bar Assn. v. Smithern*, 125 Ohio St.3d 72, 2010-Ohio-652, 926 N.E.2d 274, ¶ 13-15; *Cleveland Bar Assn. v. Harris*, 96 Ohio St.3d 138, 2002-Ohio-2988, 772 N.E.2d 621,¶ 6; and *Disciplinary Counsel v. Brown* (1996), 74 Ohio St.3d 594, 595-596, 660 N.E.2d 1147 (each imposing an indefinite suspension for misconduct involving the misappropriation or conversion of client funds). Squire, on the other hand, argues that any suspension imposed should be fully stayed on the condition that he commit no further misconduct.

{¶ 64} Although disbarment is the presumptive sanction for misappropriation, we have recognized that this sanction may be tempered with sufficient evidence of mitigating or extenuating circumstances. See, e.g., *Dayton Bar Assn. v. Gerren*, 103 Ohio St.3d 21, 2004-Ohio-4110, 812 N.E.2d 1280, ¶ 14, citing *Disciplinary Counsel v. France*, 97 Ohio St.3d 240, 2002-Ohio-5945, 778 N.E.2d 573, ¶ 11 (presumptive disciplinary measure for acts of misappropriation is disbarment); *Disciplinary Counsel v. Smith*, 101 Ohio St.3d 27, 2003-Ohio-6623, 800 N.E.2d 1129, ¶ 9 (lesser sanction of indefinite suspension based on the

mitigating evidence that respondent had been licensed to practice for approximately 45 years without any previous ethical infraction).

{¶ 65} In *Akron Bar Assn. v. Smithern*, 125 Ohio St.3d 72, 2010-Ohio-652, 926 N.E.2d 274, ¶ 5, 11, 15, we indefinitely suspended an attorney for converting client funds on more than 30 separate occasions and for depositing more than $100,000 in client retainers in her personal bank account rather than in her firm's trust account. Mitigating factors in *Smithern* included more than 20 years of practice without disciplinary violations, cooperation in the disciplinary proceedings, an agreement to make full restitution, and gambling and alcohol addictions that were causally related to Smithern's misconduct and for which she had received treatment. Id. at ¶ 10.

{¶ 66} Likewise, in *Cleveland Bar Assn. v. Harris*, 96 Ohio St.3d 138, 2002-Ohio-2988, 772 N.E.2d 621, ¶ 2-3, 6, we indefinitely suspended an attorney who had received at least $29,760.64 in alimony for a client who had been adjudicated incompetent, and he had exhausted all but $742.54 of those funds on his own " 'petty-cash-type withdrawals.' " Id at ¶ 3. Although Harris later prepared an itemized fee statement to support his claim that he had earned over $24,000 in fees, the Cuyahoga County Probate Court found him guilty of concealment, holding that "at best, respondent could have legitimately charged his client only about one third of that amount." Id. at ¶ 4. Harris, like Squire, was a military veteran and had practiced law for 27 years without incident. Id. at ¶ 6. He had also submitted letters and testimony from his pastor and several professional acquaintances, including current and former judges, attesting to his dedication and trustworthiness. Id.

{¶ 67} And in *Disciplinary Counsel v. Brown* (1996), 74 Ohio St.3d 594, 660 N.E.2d 1147, we adopted the parties' joint recommendation that Brown receive an indefinite suspension for converting $9,748.88 from an estate while entrusted with executor duties and responsibilities by his employer, the bank that

served as executor of the estate.  Id.  The parties stipulated that Brown had been indicted on six counts, including grand theft, attempted theft, and theft, arising from that conduct and five additional acts.  Id. at 594-595.  He entered a guilty plea to a third-degree felony count of grand theft and one fourth-degree felony count of theft; other charges were dismissed.  Id. at 595.  As part of this plea, Brown agreed to pay restitution on all six counts and reimburse his grandparents, from whom he had borrowed the restitution money.  Id.

{¶ 68} We have imposed partially stayed suspensions in a small number of cases involving misappropriation of client funds.   Those cases, however, generally involve attorneys who have a single incident of misconduct in an otherwise unblemished career, or who have been diagnosed with a chemical dependency or mental disability that qualifies as a mitigating factor pursuant to BCGD Proc.Reg. 10(B)(2)(g).  See, e.g., *Disciplinary Counsel v. Claflin*, 107 Ohio St.3d 31, 2005-Ohio-5827, 836 N.E.2d 564, ¶ 15 (imposing a two-year suspension, with one year stayed on conditions for an attorney who misappropriated a single client's settlement proceeds, where the misconduct represented an isolated incident in an otherwise unblemished legal career); *Disciplinary Counsel v. Blair*, 128 Ohio St.3d 384, 2011-Ohio-767, 944 N.E.2d 1161, ¶ 15, 21 (imposing a two-year suspension with 18 months stayed on conditions for an attorney's misappropriation of funds belonging to her incompetent ward when evidence demonstrated that the attorney's alcohol dependence and recurrent major depressive order were causally related to the misconduct, the attorney had achieved a sustained period of sobriety and had continued to participate in Alcoholics Anonymous and mental-health counseling, and her treating psychiatrist and Ohio Lawyers Assistance Program counselor reported that she would be able to return to the competent, ethical practice of law).

**{¶ 69}** Here, however, Squire engaged in multiple acts of misconduct, including misappropriation, spanning more than one year, and he did not suffer from any chemical dependency or mental disability that might serve to further mitigate his conduct. Moreover, the aggravating factors in this case, including Squire's dishonest or selfish motive, his pattern of misconduct involving multiple offenses, his submission of false statements and engagement in false or deceptive practice during the disciplinary proceeding, and his refusal to fully acknowledge the wrongful nature of his misconduct far outweigh those offered in mitigation. The primary purpose of the disciplinary process in Ohio is to "protect clients and the public, to ensure the administration of justice, and to maintain the integrity of the legal profession." *Disciplinary Counsel v. Hunter*, 106 Ohio St.3d 418, 2005-Ohio-5411, 835 N.E.2d 707, ¶ 32.

**{¶ 70}** Squire failed to hold client funds separate from his own property and misappropriated client funds for his own benefit, claiming that the withdrawals were advances on his attorney fees, although he did not even have a fee agreement with the affected client. He failed to maintain detailed records of the money held and disbursed on behalf of his clients, failed to maintain or produce documentation to support claimed client-related expenditures, engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation, and knowingly made false statements of material fact during the course of this disciplinary proceeding. He borrowed money from clients without disclosing the inherent conflicts of such arrangements or advising his clients to seek independent counsel, and he failed to abide by local court rules. Squire repeatedly violated his professional duties and responsibilities. Although we find that Squire's practice of more than 25 years without disciplinary action militates against permanent disbarment, we cannot conclude that respondent's character evidence—all of which relates to the early part of his career—warrants further deviation from that presumptive sanction. Therefore, we sustain relator's objection to the board's

recommended sanction and conclude that the appropriate sanction for Squire's misconduct is an indefinite license suspension.

{¶ 71} Accordingly, Percy Squire is indefinitely suspended from the practice of law in Ohio. Any future petition for Squire's reinstatement shall be conditioned upon Squire's providing, within 30 days of the date of our order, a full accounting to Mark Lay, the court, and any related party in interest for his withdrawals from, and deposits to, the $113,228.18 insurance proceeds and the $280,000 Mark Lay Defense and Welfare Fund during Squire's involvement with those funds. The accountings should set forth all payments to Squire made either directly or through an intermediary and include documentation of all fees, loans to Squire or third parties, and expenses paid on behalf of Mark Lay. As an additional condition for reinstatement, Squire shall submit proof, to be verified by relator, that he has paid restitution to the Mark D. Lay Legal Defense and Welfare Fund and the insurance fund of any unverified fees, loans, or expenses, with interest at the statutory rate. Costs are taxed to Squire.

Judgment accordingly.

O'CONNOR, C.J., and LUNDBERG STRATTON, LANZINGER, and CUPP, JJ., concur.

PFEIFER, O'DONNELL, and STEWART, JJ., dissent.

MELODY J. STEWART, J., of the Eighth Appellate District, sitting for MCGEE BROWN, J.

_____

**O'DONNELL, J., dissenting.**

{¶ 72} In this case, the majority has indefinitely suspended Percy Squire from the practice of law largely based on its determination that Squire misappropriated insurance proceeds he accepted on behalf of his client, Mark D. Lay. However, a term suspension is consistent with prior sanctions imposed by this court on other attorneys who, like Squire, utilized client funds but had no

prior discipline. Therefore, I respectfully dissent from the sanction imposed by the majority and would instead impose a two-year suspension with one year stayed on the conditions that Squire account for any expenditures from Lay's insurance proceeds, reimburse any unverified expenditures, establish an appropriate accounting system, and commit no further misconduct.

{¶ 73} The record demonstrates that Squire improperly commingled his personal funds with those held in trust for clients, disbursed funds from his client trust account to third parties without notifying the clients or keeping a proper accounting of those transactions, entered into loan agreements and business transactions with clients in which his personal interest and the interest of the client might conflict, without also recommending that the clients obtain independent legal advice, failed to enter into and keep records of fee agreements, misappropriated or converted client funds, and made inconsistent statements to disciplinary authorities.

{¶ 74} I agree with the Board of Commissioners on Grievance and Discipline that Squire's conduct violated Prof.Cond.R. 1.5(b) (requiring an attorney to communicate the nature and scope of the representation and the basis or rate of the fee and expenses within a reasonable time after commencing the representation unless the lawyer regularly represented the client and will charge the client on the same basis as previously charged), 1.8(a) (prohibiting a lawyer from entering into a business transaction with a client unless the client is advised in writing of the desirability of obtaining independent legal counsel and the terms of the transaction are fair, reasonable, and fully disclosed in a writing signed by the client), 1.15(a) (requiring a lawyer to hold property of clients separate from the lawyer's own property), 1.15(c) (requiring a lawyer to deposit into a client trust account legal fees and expenses that have been paid in advance and to withdraw them only as fees are earned or expenses incurred), 1.16(e) (requiring a lawyer to promptly refund any unearned fee upon the lawyer's withdrawal from

employment), 8.1(a) (prohibiting knowingly making a false statement of material fact in connection with a disciplinary matter), 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), and 8.4(h) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law).

{¶ 75} I also agree with the majority's conclusion that Squire lacked a prior disciplinary record and presented evidence of his good character and reputation, see BCGD Proc.Reg. 10(B)(2)(a) and (e), and agree with the findings of the board that Squire acted with a dishonest or selfish motive, engaged in a pattern of misconduct involving multiple offenses, submitted false evidence and false statements or engaged in other deceptive practices during the disciplinary proceeding, refused to acknowledge the wrongful nature of his conduct, and failed to make restitution to vulnerable clients to whom he potentially caused harm. See BCGD Proc.Reg. 10(B)(1)(b),(c),(d),(f),(g),(h), and (i).

{¶ 76} Nonetheless, I do not concur with the majority that an indefinite suspension is warranted in this case. Rather, I would accept the board's recommendation that a two-year suspension with one year stayed on conditions is appropriate. That sanction comports with the term sanctions we imposed in similar circumstances in *Disciplinary Counsel v. Crosby*, 124 Ohio St.3d 226, 2009-Ohio-6763, 921 N.E.2d 225, and *Cleveland Bar Assn. v. Mishler*, 118 Ohio St.3d 109, 2008-Ohio-1810, 886 N.E. 2d 818.

*Disciplinary Counsel v. Crosby*

{¶ 77} *Crosby* used his client trust account containing approximately $287,000 for personal and business matters for more than one year. Further, he did not properly train or supervise his paralegal, who was an authorized signer on the account, did not personally reconcile the bank statements, and kept a running total of the earned attorney fees owed to him only in his head. Id. at ¶ 3, 8-9.

{¶ 78} Based upon that conduct, we found that Crosby's conduct, which occurred both before and after the February 1, 2007 effective date of the Rules of Professional Conduct, had resulted in violations of DR 1-102(A)(6) and Prof.Cond.R. 8.4(h) (both prohibiting conduct that adversely reflects on the lawyer's fitness to practice law), DR 9-102(A) and/or Prof.Cond.R. 1.15(a) (both requiring a lawyer to hold property of clients separate from the lawyer's own property), DR 1-102(A)(5) and Prof.Cond.R. 8.4(d) (prohibiting a lawyer from engaging in conduct that is prejudicial to the administration of justice), DR 9-102(B)(3) and 1.15(a) (both requiring a lawyer to hold property of clients separate from the lawyer's own property), Prof.Cond.R. 5.3(b) (requiring a lawyer to take reasonable efforts to ensure that a nonlawyer employee's conduct is compatible with the professional obligations of the lawyer), Prof.Cond.R. 1.15(a)(2) (requiring a lawyer to maintain a record for each client on whose behalf funds are held), and 1.15(a)(3) (requiring a lawyer to maintain a record for the lawyer's client trust account, setting forth the name of the account, the date, amount, and client affected by each credit and debit, and the balance in the account). Id. at ¶ 7, 11, and 14.

{¶ 79} As aggravating factors, we found that Crosby had engaged in a pattern of misconduct, had acted with a dishonest and selfish motive by using his client trust account to hide his personal funds from his creditors, and had failed to fully cooperate in the disciplinary process by lying about his reasons for using his client trust account in an unorthodox manner. Id. at ¶ 17. There was no evidence tending to demonstrate that any clients suffered any financial losses as a result of Crosby's misconduct. Id. at ¶ 16.

{¶ 80} Observing that Crosby did not have a prior disciplinary record, we concluded that a 24-month suspension was adequate to protect the public and conditioned Crosby's reinstatement on the completion of 12 hours of continuing legal education in law-office management and accounting and the payment in full

or evidence of a compromise of a number of monetary judgments obtained against Crosby.  Id. at ¶ 22.

*Cleveland Bar Assn. v. Mishler*

**{¶ 81}** In *Cleveland Bar Assn. v. Mishler*, 118 Ohio St.3d 109, 2008-Ohio-1810, 886 N.E. 2d 818, ¶ 5, a client paid Mishler $17,600 in connection with an employment-discrimination suit, though Mishler had agreed to pursue the case for $10,000.  Mishler later settled the client's claim for $7,500 without the client's knowledge or consent, signed the client's name to the settlement check without authorization, failed to give the client any of the settlement proceeds, and also failed to return any of the client's unexpended funds.  Id. at ¶ 20.

**{¶ 82}** There, we determined that Mishler had violated DR 1-102(A)(4) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation), 1-102(A)(5) (prohibiting conduct that is prejudicial to the administration of justice), 1-102(A)(6) (prohibiting conduct that adversely reflects on the lawyer's fitness to practice law), 7-101(A) (prohibiting a lawyer from intentionally failing to seek a client's lawful objectives), 7-101(A)(3) (prohibiting a lawyer from damaging or prejudicing a client during representation), 9-102(B)(1) (requiring a lawyer to promptly notify a client of received funds belonging to the client), and 9-102(B)(4) (requiring a lawyer to promptly deliver requested funds that the client is entitled to receive).  Id. at ¶ 23.

**{¶ 83}** With respect to a second client, we found that Mishler had failed to reliably account for how he earned or appropriately spent $5,000 in client funds for an employment-discrimination claim for which he did not commit any fee agreement to writing and had no records of the time he had spent on the case.  Id. at ¶ 24-25, 28-29.  We further found that his conduct was prejudicial to the administration of justice and adversely reflected on his fitness to practice law, and that by retaining the client's funds, he had collected a clearly illegal or excessive fee.  Id. at ¶ 29.  Although Mishler eventually refunded money to both clients, we

found that the mitigating effect of the refunds was diminished by the fact that Mishler had waited until just before the panel hearing to make them. Id. at ¶ 41.

{¶ 84} In sanctioning Mishler, we noted that the presumptive sanction for misappropriation is disbarment and that misconduct involving dishonesty, fraud, deceit, or misrepresentation requires a period of actual suspension from the practice of law. Id. at ¶ 44. Recognizing his more than 30 years of practice without incident and letters from attorneys and a former colleague attesting to his good character, we concluded that an extended suspension with provisions for a partial stay and probation would be in the best interest of the public and the respondent, and we therefore suspended him from the practice of law for two years and stayed the final year on the conditions that he (1) not commit any other ethical violations and (2) fully account to the affected clients for his fees and expenses and refund any unverified fees and expenses owed to them with interest at the statutory rate for judgments. In addition to imposing a one-year period of probation upon reinstatement, we required Mishler to establish an office accounting system to accurately track the receipt and disbursement of client funds. Id. at ¶ 45, 47.

{¶ 85} Squire's commingling of personal and client funds and his failure to maintain adequate records of those funds in his possession are most comparable to the misconduct in *Crosby* and *Mishler*. In the instant case, Squire's conduct with respect to the insurance proceeds occurred during only a two-month period. Although Squire committed other acts of misconduct between 2007 and 2008, he has practiced law for nearly 30 years without incident.

{¶ 86} The primary purpose of the disciplinary process in Ohio is to "protect clients and the public, to ensure the administration of justice, and to maintain the integrity of the legal profession." *Disciplinary Counsel v. Hunter*, 106 Ohio St.3d 418, 2005-Ohio-5411, 835 N.E.2d 707, ¶ 32. In my view, this purpose would be served by ordering a term sanction with conditions that require

Squire to account for any expenditures from Lay's insurance proceeds, reimburse any unverified expenditures, and establish an appropriate accounting system. Thus, I would impose a two-year suspension with one year stayed on the conditions that within 30 days, Squire (1) fully account to his client and any related party in interest for expenditures made from the insurance proceeds Squire accepted on behalf of Lay, (2) submit documentation satisfactory to relator that he has paid restitution for any unverified fees, loans, or expenses, with interest at the statutory rate, (3) serve one year of monitored probation during the stayed portion of his suspension pursuant to Gov.Bar R. V(9), (4) establish an office accounting system to accurately track receipts, which will be subject to review and monitoring as part of his probation, and (5) commit no further misconduct. Accordingly, I dissent.

PFEIFER and STEWART, JJ., concur in the foregoing opinion.

_____

Jonathan E. Coughlan, Disciplinary Counsel, and Karen H. Osmond, for relator.

Percy Squire, pro se.

_____