[Cite as *Pertoria, Inc. v. Bowling Green State Univ.*, 2014-Ohio-3793.]
IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Pertoria, Inc., | : | |
| Plaintiff-Appellee, | : | Nos. 13AP-1033 |
| | | and |
| v. | : | 14AP-63 |
| | | (Ct. of Cl. No. 2010-03967) |
| Bowling Green State University, | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on September 2, 2014

*Lyden, Chappell & Dewhirst, Ltd.*, *Erik G. Chappell* and *Julie A. Douglas*; *Maloney McHugh & Kolodgy, Ltd.*, and *William T. Maloney*, for appellee.

*Michael DeWine*, Attorney General, *Randall W. Knutti* and *Frank S. Carson*, for appellant.

APPEALS from the Court of Claims of Ohio

O'GRADY, J.

{¶ 1} In these consolidated appeals, defendant-appellant, Bowling Green State University ("BGSU"), appeals from a judgment of the Court of Claims of Ohio in favor of plaintiff-appellee, Pertoria, Inc. ("Pertoria"). For the reasons that follow, we affirm in part, reverse in part, and remand for further proceedings.

I. FACTUAL AND PROCEDURAL BACKGROUND

{¶ 2} Pertoria owed and operated several "Wendy's®" (hereinafter "Wendy's") franchise restaurants. Pertoria and BGSU entered into a written operating agreement and lease that allowed Pertoria to operate a Wendy's restaurant in BGSU's newly renovated student union. In 2010, Pertoria filed a complaint against BGSU alleging multiple claims which were later dismissed with the exception of claims for tortious interference with

business relationships and breach of contract (based on breach of an implied duty of good faith and fair dealing) arising on or after March 4, 2008. BGSU filed its answer, and the Court of Claims bifurcated the issues of liability and damages for trial.

{¶ 3} At the liability trial, Rebecca Williams, Pertoria's president, testified she learned about the opportunity to have a Wendy's restaurant at BGSU from Wendy's International. A Wendy's located at BGSU would only receive one parking space and would not have a drive-thru, which normally accounted for approximately 70 percent of Pertoria's business. Therefore, Williams had to ensure BGSU's campus had enough foot traffic to generate the sales Pertoria needed.

{¶ 4} In evaluating the BGSU opportunity, Williams considered a request for proposal ("RFP") from BGSU for a "National/Regional Branded, Quick Service Hamburger/Beef Concept" to be incorporated into the student union. (Plaintiff's exhibit A, 1.) According to the RFP, the student union was to include multiple dining options, including a food court and café. The RFP stated in 1998 BGSU dining services had sales in excess of 14.7 million dollars, and projected sales for 2000-2001 exceeded 17 million dollars. The RFP also stated BGSU had 17,734 students on the main campus, and 6,900 of those students lived in residence halls or small group residences. Section 2.2 of the RFP provides:

> Payment for food purchases within the food court, branded concepts, cafe, pub, and restaurant may be cash, credit, BGSU Big Charge, or meal plan debit purchases. The official University identification card will provide access to meal plan debit accounts and BiG Charge accounts. Payment for purchases within the Food Court will be processed at centralized cashiering stations. **The "Stand Alone" branded concept will have individual cashier stations but will utilize the Diebold System for processing transactions. Computerized Register Equipment must be purchased from Diebold. A fee of 3% of the combined gross sales of BiG charge and meal plan debit transactions will be paid to the University for use of the University's administrative computer systems.**

(Emphasis sic.) (Plaintiff's exhibit A, 6.) Dr. Edward Whipple, BGSU's vice president of student affairs, acknowledged he knew of no reason why a potential third-party vendor should not have relied on the information in section 2.2 of the RFP.

{¶ 5}  Williams spoke with university officials about the meal plan and BiG charge, which operated like a credit card.  When asked if anyone suggested BGSU could take away Pertoria's ability to accept meal plan funds, Williams testified, "No.  Because if I couldn't take meal plan dollars, there would be no purpose to have me be there."  (R. 113, 26.)

{¶ 6}  Pertoria and BGSU entered into the operating agreement and lease on October 17, 2001.  Both contracts ended on May 12, 2007, but gave Pertoria the option to extend them for a five-year term, ending on May 12, 2012.  If Pertoria did exercise its extension option, the agreement and lease and each of their "covenants, agreements and provisions" would "remain in full force and effect during the Term as extended and with the same force and effect as if the Term" of the agreement and lease "were originally for such extended period."  (Plaintiff's exhibit B, 2.)

{¶ 7}  In addition, section 3.23 of the operating agreement provided:

> During the Term, [Pertoria] shall:
>
> * * *
>
> Install and maintain charge and debit card readers at each cashier station of the Store conforming to the specifications set forth in Schedule 3.23[1] pursuant to which authorized BiG charge and meal plan debit card holders may pay for purchases from the Store.  The University will pay over to the Operator monthly the amount of net charge or debit sales from the preceding month within twenty days after the end of such preceding month, less an administrative fee of 2%, and will use good faith efforts to pay over such amounts and transmit such reports as soon as practical after the end of each such month. The 2% administrative [fee] will be used by the University to defray, in part, the University's costs of administering its charge and debit card sale systems. The University will provide the Operator with a report of monthly net charge or debit sales activity together with such monthly payments.

 (Footnote added.)  (Plaintiff's exhibit B, 2, 5.)

{¶ 8}  Also, under the operating agreement, BGSU promised to not allow a third-party to operate a quick-service hamburger concept restaurant in the student union.  However, BGSU reserved the right to sell the same or similar products to those Pertoria

---

[1] The record does not contain Schedule 3.23.

offered in one or more of the restaurants or food service establishments BGSU owned and operated in the student union.  The agreement also contained a clause which provided:

> Limitation of Damages.  In no event shall a party be liable to another party for any consequential special, or incidental damages, including lost profits, lost business opportunity, or similar expectancy damages arising from the transactions which are the subject of this Agreement.

(Plaintiff's exhibit B, 8.)

{¶ 9}   The renovated student union opened in January 2002, but Wendy's did not open until April 2002.  According to Williams, the delay occurred because an exhaust system needed to be redone.  Once Wendy's was otherwise ready, its opening was delayed a few more days because BGSU would not allow Wendy's to open until the required card readers were installed.  Pertoria initially paid $25,000 for the card readers and later, around 2007, spent $10,000 to update the card readers.

{¶ 10} At the time Wendy's opened, it had full access to all meal plan funds and allowed students to use those funds to purchase Wendy's gift certificates.  In March 2003, BGSU asked Wendy's to discontinue its gift certificate practice, and Wendy's complied.  In fall 2003, BGSU altered its meal plan structure.  Students had a set number of meal plan funds they could use at residential dining facilities and a smaller number of meal plan funds, called flex funds,[2] they could use at the student union.  Dr. Whipple testified this change was made because too much money was being spent at the student union instead of the dining halls.  Williams protested the change, but Pertoria did not take legal action after determining Wendy's could still be profitable even with the meal plan changes.  Subsequently, BGSU occasionally gave Wendy's unrestricted access to meal plan funds, such as on weekends or during the summer.  Despite these changes, Pertoria did not attempt to renegotiate the terms of the operating agreement when it exercised its option to extend the operating agreement and lease.

{¶ 11} BGSU's former Associate Vice President of Student Affairs, Dr. Joe Oravecz, requested a review of BGSU's dining services operations by the National Association of College and University Food Services.  The review occurred in February 2009, and the review team's report states:

---

[2] At some point in time, flex funds were referred to as Falcon Dollars.

> Wendy's restaurant is generating about $1,224,751 in total revenue. Our review team recommends that Dining Services manage this restaurant instead of an outside contractor. The average direct cost (i.e., food, labor, and benefits) for all cash operations at BTSU[3] is 69.4%. If the restaurant were managed in-house and after all direct costs were covered, approximately $374,774 of additional revenue would be available to Dining Services. If the department were outsourced, this money would not be available to the university.

(Footnote added.) (Plaintiff's exhibit L, 5.) The report also states: "Wendy's should not be accepting flex funds. This would add $1,224,751 to revenue annually." (Plaintiff's exhibit L, 19.)

{¶ 12} Dr. Oravecz asked BGSU's dining advisory board (the "board") to make recommendations about the meal plan and use of meal plan funds at Wendy's. At that time, Wendy's was the only restaurant in the student union not owned by BGSU. According to Susan Swinford, chair of the board, Dr. Oravecz was concerned Wendy's was earning over one million dollars but not reinvesting that money into BGSU. The board had several meetings at which the possibility of prohibiting Wendy's access to meal plan funds was discussed. Swinford did not recall any discussion at the meetings about whether it would be fair to take revenue from Wendy's.

{¶ 13} On April 29, 2009, Swinford sent Dr. Whipple a memorandum on the board's recommendations. According to the memorandum, varying percentages of board members supported one of three scenarios, all of which involved the elimination of use of all meal plan funds at Wendy's. Then, on May 1, 2009, Dr. Whipple notified Williams via letter that no meal plan funds could be used at Wendy's effective July 1, 2009. The letter stated:

> This is to notify you that beginning July 1, 2009, BGSU Dining Services Flex Funds will no longer be available for use at Wendy's.
>
> As you know, your company's agreements with BGSU do not provide for participation in the University Dining Services meal payment programs. However, BGSU Dining Services from time to time reviews its various meal payment programs.

---

[3] BTSU stands for "Bowen-Thompson Student Union" at BGSU.

>When it is useful to accomplish the goals of the University Dining Services and business operations, it revises those plans. In the past this has resulted in University Dining Services allowing some limited use of BGSU meal payment plans at Wendy's. The use of University Dining Services meal payment plans at Wendy's has been revised on several occasions, most recently at the beginning of this academic year when we limited the use of these plans at Wendy's.
>
>Please know that BGSU faculty, students, and staff can continue to use their BG1 Cards[4] and other charge cards at Wendy's per the specific terms of our agreements. Please let me know if you have any questions.

(Footnote added.) (Plaintiff's exhibit S.) Wendy's became the only restaurant in the student union that could not accept any meal plan funds; however, BGSU owned all other dining locations in the student union. According to Williams, Wendy's sales dropped after this change took effect.

{¶ 14} In its liability decision, the Court of Claims found BGSU liable for breach of contract because it violated an implied duty of good faith. The Court of Claims acknowledged the operating agreement did not prohibit BGSU from altering the terms of meal plan funds. However, BGSU acted in bad faith by prohibiting Wendy's from accepting any meal plan funds. The Court of Claims found the parties' arrangement contemplated access to such funds, and Pertoria could have anticipated reasonable restrictions on its access but not a blanket prohibition. The prohibition hurt Wendy's sales and impaired Pertoria's ability to receive the benefit of the bargain. Also, the Court of Claims found Pertoria proved its claim for tortious interference with business relationships; however, Pertoria later declined to seek damages for this claim.

{¶ 15} On April 30, 2013, almost one year after the extended lease and operating agreement expired, BGSU sought leave to amend its answer to assert a counterclaim for unpaid rent and a setoff defense. The Court of Claims granted the motion and BGSU filed its amended answer.

{¶ 16} At the damages hearing, the Court of Claims heard evidence related to Pertoria's losses from the prohibition on access to meal plan funds. In addition, the Court of Claims heard evidence on the parties' competing interpretations of the rent provisions

---

[4] The BG1 card was evidently the successor to BiG charge.

in the lease.  The lease discussed both "minimum rent" and "percentage rent."  (Plaintiff's exhibit C, 2.)  BGSU maintained during the 120 months, or 10 years, the lease was in effect, Pertoria only paid percentage rent and failed to pay minimum rent of $4,000 per month, or $480,000 in total.  Pertoria maintained the parties previously agreed the rent provisions were ambiguous, agreed on a method for the calculation of rent, and maintained a course of performance consistent with that agreement for 10 years.

{¶ 17} On November 5, 2013, the Court of Claims issued a decision and judgment entry awarding Pertoria $459,963 as damages for BGSU's breach of contract.  Regarding BGSU's counterclaim, the Court of Claims found Pertoria never paid rent in the manner advocated for by BGSU in the entire ten-year term of the lease, and BGSU never complained Pertoria was incorrectly calculating rent until after the issuance of a liability decision in favor of Pertoria.  The Court of Claims found the lease's rent provisions ambiguous and looked to evidence of the parties' ten-year course of dealings to interpret the provisions.  The Court of Claims found through their course of dealings, the parties manifested an intent to have the contract interpreted in a way consistent with how Pertoria had paid its rent.  The Court of Claims noted Williams testified she spoke with Wanda Overlin, BGSU's dean of students, and Overlin gave her instructions on how to pay rent.  In addition, in a 2007 e-mail, Mary Edgington, BGSU's director of the student union, expressed satisfaction with the method in which Pertoria had been calculating rent. The Court of Claims also stated "an argument can be made that Defendant's conduct amounted to an estoppel."  (R. 98, 7.)  Therefore, the Court of Claims found BGSU failed to prove its counterclaim by a preponderance of the evidence.

{¶ 18} Pertoria filed a motion for prejudgment interest, which BGSU opposed. Before the Court of Claims ruled on the motion, BGSU filed a notice of appeal, in case No. 13AP-1033, from the Court of Claims' November 5, 2013 entry.  *See Reida v. Thermal Seal, Inc.*, 10th Dist. No. 01AP-354 (Nov. 29, 2001) (finding judgment entry not a final appealable order where issue of prejudgment interest had not been resolved).  On December 20, 2013, the Court of Claims issued an entry modifying its November 2013 entry to additionally award Pertoria $51,323.68 in prejudgment interest.  BGSU filed a notice of appeal, in case No. 14AP-63, from the December 2013 entry.

## II. ASSIGNMENTS OF ERROR

{¶ 19} BGSU appeals and assigns the following assignments of error in case No. 13AP-1033 for our review:

> [I.] There Can Be No Breach of an "Implied Duty of Good Faith" When the Parties Had Every Opportunity to Negotiate the Terms of Their Contract But Elected Not to do so.
>
> [II.] The Court of Claims Awarded Lost Profits as Damages Despite the Fact That the Operating Agreement Expressly Excluded Lost Profits.
>
> [III.] The Court Erred as a Matter of Law by Finding That BGSU Waived Its Right to Recover Lost Rent.
>
> [IV.] The Court Erred as a Matter of Law by Awarding Damages with No Evidence of Causation.

{¶ 20} BGSU assigns the following assignment of error in case No. 14AP-63:

> ASSIGNMENT OF ERROR: THE COURT'S AWARD OF PREJUDGMENT INTEREST IS ERRRONEOUS [sic] AS A MATTER OF LAW BECAUSE (A) IT RESTS ON A FALSE ASSUMPTION AS TO WHEN PROFITS WERE LOST AND (B) NO OHIO COURT HAS EXTENDED THE STATUTORY RIGHT TO PREJUDGMENT INTEREST UNDER R.C. 1343.03 (A) TO "IMPLIED DUTY OF GOOD FAITH" CLAIMS.

## III. DISCUSSION

### A. Breach of Contract by BGSU

{¶ 21} Under its first assignment of error in case No. 13AP-1033, BGSU contends the Court of Claims erred when it found BGSU breached the operating agreement by breaching the implied duty of good faith. "For a breach of contract claim, several elements must be present: the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *State of Ohio Dept. of Dev. v. Matrix Centennial, L.L.C.*, 10th Dist. No. 14AP-47, 2014-Ohio-3251, ¶ 16, citing *Doner v. Snapp*, 98 Ohio App.3d 597, 600 (2d Dist.1994). When, as in this case, the pertinent facts are undisputed, "the determination of whether conduct constitutes a breach of contract is a question of law." *Maghie & Savage, Inc. v. P.J. Dick Inc.*, 10th Dist. No. 08AP-487, 2009-Ohio-2164, ¶ 29, citing *Corna/Kokosing Constr. Co. v. South-Western City School*

*Dist. Bd. of Edn.*, 10th Dist. No. 02AP-624, 2002-Ohio-7028, ¶ 12, citing *Luntz v. Stern*, 135 Ohio St. 225 (1939), paragraph five of the syllabus.

{¶ 22} "[T]here is an implied duty of good faith and fair dealing in every contract." *Am. Contractor's Indemn. Co. v. Nicole Gas Production, Ltd.*, 10th Dist. No. 07AP-1039, 2008-Ohio-5056, ¶ 13, citing *DVCC, Inc. v. Med. College of Ohio*, 10th Dist. No. 05AP-237, 2006-Ohio-945, ¶ 20. Good faith is " ' "a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." ' " *Interstate Gas Supply, Inc. v. Calex Corp.*, 10th Dist. No. 04AP-980, 2006-Ohio-638, ¶ 97, quoting *Ed Schory & Sons, Inc. v. Soc. Natl. Bank*, 75 Ohio St.3d 433, 443-44 (1996), quoting *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (C.A.7, 1990); and citing *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87 (N.Y.App.1933) (stating that " 'in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing' "). The duty of good faith " ' "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." ' " *In re Progressive Medina Real Estate, L.L.C.*, 10th Dist. No. 11AP-141, 2012-Ohio-1071, ¶ 23, quoting *Littlejohn v. Parrish*, 163 Ohio App.3d 456, 2005-Ohio-4850, ¶ 26 (1st Dist.), quoting Restatement of the Law 2d, Contracts, Section 205, comment a (1981).

{¶ 23} The Court of Claims found BGSU violated the implied duty of good faith by imposing a blanket prohibition on the use of meal plan funds at Wendy's. In the operating agreement, the only reference to meal plan funds appears in section 3.23, which obligates Pertoria to "[i]nstall and maintain charge and debit card readers at each cashier station of the Store conforming to the specifications set forth in Schedule 3.23 pursuant to which authorized BiG charge and meal plan debit card holders may pay for purchases from the Store." (Plaintiff's exhibit B, 5.) In addition, BGSU agreed to pay to Pertoria "monthly the amount of net charge or debit sales from the preceding month within twenty days after the end of such preceding month, less an administrative fee of 2%" and to "use good faith efforts to pay over such amounts and transmit such reports as soon as practical

after the end of each month." (Plaintiff's exhibit B, 5.) The operating agreement does not guarantee Pertoria access to meal plan funds or restrict BGSU's ability to curtail use of meal plan funds at Wendy's in anyway.

{¶ 24} BGSU contends Pertoria could have contemplated a prohibition on the use of meal plan funds at Wendy's, and it is inappropriate to use the implied duty of good faith to craft for Pertoria an agreement for which it failed to negotiate. Pertoria claims it could not have contemplated BGSU denying it access to all meal plan funds at the time of contracting, particularly in light of representations made in the RFP and operating agreement about payment with the meal plan.

{¶ 25} From section 3.23 of the operating agreement, Pertoria could justifiably expect the card readers to serve a purpose in processing payments at Wendy's, but Pertoria could not expect access to any particular amount of meal plan funds. Pertoria does not claim the prohibition on meal plan funds rendered the card readers useless. To the contrary, it appears Pertoria could always use the card readers to accept payment via BiG charge or its apparent successor, the BG1 card.

{¶ 26} Additionally, from the RFP, Pertoria knew BGSU operated on-campus dining facilities and intended to operate dining facilities in the new student union. It was apparent from the inception of the parties' relationship that they would be competitors for the business of students, faculty, non-teaching staff, and others on BGSU's campus. The operating agreement even allows BGSU to sell the same types of food as Wendy's at the student union. The operating agreement contemplates the fact that the parties might interfere with each other's profits, expressly prohibiting liability for "consequential special, or incidental damages, including lost profits." (Plaintiff's exhibit B, 8.) Given Pertoria's stance on the importance of meal plan funds to the profitability of on-campus food service businesses, Pertoria could have contemplated action by BGSU, its competitor, to increase BGSU's profits at the expense of Pertoria's profits by eliminating the use of meal plan funds at Wendy's.

{¶ 27} The implied duty of good faith does not mean one party must put the other party's interests above its own. *Wells Fargo Bank, N.A. v. Daniels*, 1st Dist. No. C-110209, 2011-Ohio-6555, ¶ 15, citing *Ed Schory* at 443-44. Moreover, as BGSU points out, if access to meal plan funds was essential to Pertoria's decision to enter the student

union, Pertoria should have negotiated for guaranteed access to those funds.  The implied duty of good faith is "limited in scope and cannot create rights and duties not otherwise provided for in the contract."  *Lawarre v. Fifth Third Secs., Inc.*, 1st Dist. No. C-110302, 2012-Ohio-4016, ¶ 34-35, citing *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).  Stated differently, a party cannot use this duty to "obliterate the notion of a written contract as the expression of mutual understandings" and construct the contract the party "would have liked to have had."  *Precision Seed Co. v. Consolidated Grain & Barge Co.*, S.D.Ohio No. 3:03-cv-079 (May 5, 2006).

{¶ 28} BGSU emphasizes the fact that when Pertoria exercised its option to extend the operating agreement, it made no effort to renegotiate the terms of the agreement.  Pertoria correctly points out that the exercise of its option did not create a new contract.  *See Barry v. The Cincinnati Ins. Cos.*, 10th Dist. No. 01AP-1437, 2002-Ohio-4898, ¶ 23, citing *State ex rel. Preston v. Ferguson*, 170 Ohio St. 450, 457-58 (1960) ("[T]he exercise of an option to extend a contract does not result in a new contract. * * * Rather, once the option is exercised, the original contract is valid for both the initial contract term and an additional term.").  Nonetheless, Pertoria could have requested modifications to the contract and did not, even though BGSU had demonstrated its willingness to alter Wendy's access to meal plan funds to suit BGSU's needs.  At the damages hearing, Williams even acknowledged she realized BGSU might reduce meal plan access more than it already had.

{¶ 29} In sum, BGSU did not have a duty to grant Pertoria access to any particular amount of meal plan funds, and it did not breach the implied duty of good faith by prohibiting Pertoria's access to such funds.  Pertoria could have contemplated its competitor's decision to prohibit the use of meal plan funds at Wendy's and cannot now use the implied duty of good faith to include a provision in the operating agreement for which it failed to negotiate.  Although Pertoria may have lost sales due to BGSU's decision to prohibit meal plan access, the sales loss did not injure Pertoria's right to receive the fruits of the contract as it failed to bargain for such access in the first instance.

{¶ 30} Accordingly, the Court of Claims' finding of breach was in error, and we sustain the first assignment of error.  We reverse the judgment to the extent it found BGSU liable for breach of contract.  In the absence of a breach of contract, Pertoria was

not entitled to damages in this matter; therefore, we also reverse the Court of Claims' award of damages. We note Pertoria maintains that even if we find no breach of contract, it is still entitled to recover damages for BGSU's tortious conduct. However, Pertoria abandoned its claim for damages on its only tort claim, tortious interference with business relationships, at the end of the damages hearing. The Court of Claims' November 5, 2013 decision explicitly notes Pertoria advised the Court of Claims it was only seeking damages for breach of contract and not the tort claim.

{¶ 31} In its second and fourth assignments of error in case No. 13AP-1033 and in its sole assignment of error in 14AP-63, BGSU challenges various aspects of the damages award for Pertoria's breach of contract claim. However, the Court of Claims premised the award of damages on its erroneous determination that BGSU breached the operating agreement. Therefore, these assignments of error are rendered moot by our decision to sustain BGSU's first assignment of error in case No. 13AP-1033, and we need not address them. App.R. 12(A)(1)(c).

**B. Pertoria's Breach of Contract**

{¶ 32} Under its third assignment of error in case No. 13AP-1033, BGSU contends the Court of Claims erred in finding BGSU waived its right to recover lost rent.

{¶ 33} BGSU maintains the Court of Claims never determined what the rent provisions in the lease meant, but, instead, found BGSU waived its right to recover ten years of unpaid rent based on the actions of employees who lacked authority to contractually bind BGSU. After finding the rent provisions of the lease ambiguous, the Court of Claims, based on the parties' ten-year course of dealings, implicitly resolved that ambiguity in a manner consistent with Pertoria's interpretation of the agreement. *See St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 2007-Ohio-5026, ¶ 39, quoting *Consol. Mgt., Inc. v. Handee Marts, Inc.*, 109 Ohio App.3d 185, 191 (8th Dist.1996), quoting 18 Ohio Jurisprudence 3d, Contracts, Section 160, at 46 (1980) (" ' "[T]he practical construction made by the parties may be considered by the court as an aid to its construction when the contract is ambiguous, uncertain, doubtful, or where the words thereof are susceptible to more than one meaning, or when a dispute has arisen between the parties after a period of operation under the contract." ' "). (Emphasis deleted.) As the Court of Claims' decision indicates, BGSU accepted rent from Pertoria for

ten years and did not complain about the manner in which rent was calculated until after the Court of Claims issued a liability decision in favor of Pertoria.

{¶ 34} BGSU does not assign as error the Court of Claims' finding that the rent provisions in the lease were ambiguous or the Court of Claims' resolution of that ambiguity. Instead, BGSU takes issue with the Court of Claims' statement that an argument could be made that BGSU's conduct amounted to estoppel, presumably referring to the doctrine of waiver by estoppel. Therefore, even if we viewed the statement regarding estoppel as an alternative basis for its judgment, and even if we agreed the Court of Claims erred in its application of that doctrine, we would have to affirm the judgment on the counterclaim. *See Roberts v. Columbus City Police Impound Div.*, 195 Ohio App.3d 51, 2011-Ohio-2873, ¶ 17 (10th Dist.) (stating trial court's judgment must stand where appellant only challenges one of two separate and independent reasons the court gave for the judgment). Accordingly, we overrule the third assignment of error in case No. 13AP-1033.

## IV. CONCLUSION

{¶ 35} In case No. 13AP-1033, we sustain the first assignment of error. We reverse the Court of Claims' judgment to the extent it found BGSU liable for breach of contract and awarded damages for that breach, including prejudgment interest. This decision renders moot BGSU's second and fourth assignments of error in case No. 13AP-1033 and sole assignment of error in case No. 14AP-63. Also, we overrule BGSU's third assignment of error in case No. 13AP-1033. Accordingly, we affirm the Court of Claims' judgment in part, reverse it in part, and remand for further proceedings consistent with this decision.

*Judgment affirmed in part,*
*reversed in part, and cause remanded.*

SADLER, P.J., and TYACK, J., concur.