| | |
|---|---|
| CLEVELAND HEARING AND BALANCE CENTER, INC., et al. | Case No. 2016-00102 |
| Plaintiffs | Judge Patrick M. McGrath<br>Magistrate Robert Van Schoyck |
| v. | DECISION |
| NORTHEAST OHIO MEDICAL UNIVERSITY | |
| Defendant | |

**{¶1}** On January 10, 2017, defendant filed a motion for summary judgment pursuant to Civ.R. 56(B). Plaintiffs were granted two separate extensions of time, until February 23, 2017, to file a response. On February 24, 2017, plaintiffs filed a motion to deem as timely a concurrently-filed response, which is GRANTED. Also on February 24, 2017, defendant filed a motion for leave to file a reply brief, which is GRANTED. The motion for summary judgment is now before the court for a non-oral hearing pursuant to L.C.C.R. 4(D).

**{¶2}** Civ.R. 56(C) states, in part, as follows:

**{¶3}** "Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor." *See also*

*Gilbert v. Summit Cty.*, 104 Ohio St.3d 660, 2004-Ohio-7108, citing *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317 (1977).

{¶4} As set forth in the complaint, plaintiff, Cleveland Hearing and Balance Center, Inc. (CHBC), was a corporation owned by plaintiff, Dr. Mohamed A. Hamid. The complaint provides that CHBC and Dr. Hamid operated a medical practice focused on "auditory and vestibular (hearing and balance) issues," but that Dr. Hamid is now retired and CHBC has been dissolved.

{¶5} It is alleged that CHBC entered into a business relationship with the Saudi Arabian Cultural Mission (SACM) under which CHBC and Dr. Hamid would provide "educational fellowship clinical training for Dr. Fuad Alghamdi, a Saudi citizen, for 3 years beginning April 1, 2012 and ending March 31, 2015." It is alleged that CHBC separately made a subcontracting agreement with defendant, Northeast Ohio Medical University (NEOMED), under which NEOMED was to provide 20 percent of Dr. Alghamdi's training, comprising the research component of his fellowship, and CHBC would provide the clinical component that comprised the other 80 percent of the training.

{¶6} According to the complaint, the fellowship proceeded through the second year but "Dr. Alghamdi experienced some personal issues in early 2014, and eventually stopped attending the clinics with CHBC in early March 2014." It is also alleged that "Dr. Hamid and CHBC had concerns about the level of effort and progress Dr. Alghamdi was putting into his fellowship." The complaint states that "NEOMED used this as an opportunity to deal directly with SACM in an attempt to receive the payment CHBC would receive" for the third year of the fellowship and that NEOMED "encouraged Dr. Alghamdi to obtain a lawyer to facilitate the breach of the agreement between CHBC and SACM." The complaint provides that ultimately "SACM and NEOMED reached an agreement that SACM would pay NEOMED directly for Dr. Alghamdi's third year of

fellowship training," but in the end "Dr. Alghamdi returned to Saudi Arabia and did not complete his fellowship."

{¶7} In their complaint, CHBC and Dr. Hamid named as defendants both NEOMED and SACM, asserting claims for breach of the contractual duty of good faith against NEOMED and SACM, declaratory judgment as to CHBC and Dr. Hamid's rights under both the contract with SACM and the subcontracting agreement with NEOMED, and, as against NEOMED only, a claim of tortious interference with CHBC and Dr. Hamid's business relationship with SACM.   On February 16, 2016, SACM was dismissed as a party on the basis that only state agencies and instrumentalities can be defendants in original actions in the Court of Claims pursuant to R.C. 2743.02(E).

{¶8} NEOMED, as the lone remaining defendant in the action, seeks summary judgment as to all claims asserted against it.   In support of its motion, NEOMED submitted a transcript of the deposition of Dr. Hamid, as well as an affidavit from Jeffrey Wenstrup, Ph.D., who is employed with NEOMED as a Professor and Chair of the Department of Anatomy and Neurobiology, Associate Dean of Research for the College of Medicine, and Director of the Auditory Neurosciences Group.   Attached to both Dr. Hamid's deposition transcript and Dr. Wenstrup's affidavit are several authenticated documents.

{¶9} The court shall first address the claim that NEOMED tortiously interfered with CHBC and Dr. Hamid's business relationship with SACM.   "'The elements of tortious interference with a business relationship are (1) a business relationship; (2) the tortfeasor's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom.'"   *Walter v. ADT Sec. Sys., Inc.*, 10th Dist. Franklin No. 06AP-115, 2007-Ohio-3324, ¶ 31, quoting *Diamond Wine & Spirits v. Dayton Heidelberg Distrib. Co., Inc.*, 148 Ohio App.3d 596, 2002-Ohio-3932, ¶ 23 (3rd Dist.).   "The preeminent difference between tortious interference with a business relationship and tortious interference with a contractual

relationship is that interference with a business relationship covers intentional interference with prospective contractual relations not yet reduced to contract." *Miller v. J.B. Hunt Transp., Inc.*, 10th Dist. Franklin No. 13AP-162, 2013-Ohio-3892, ¶ 21.

{¶10} There is no dispute that CHBC and Dr. Hamid had a business relationship with SACM and that NEOMED had knowledge of that business relationship. According to Dr. Hamid's deposition testimony, he and CHBC never had any other business relationship with SACM beyond the one pertaining to Dr. Alghamdi's fellowship. (Dep., p. 15.) The third element of the claim, going to whether there was an intentional interference on the part of NEOMED causing a breach or termination of the business relationship, is a matter of disagreement between the parties.

{¶11} Regarding the course of events that led up to the termination of the fellowship, Dr. Hamid testified in his deposition that problems started to arise several months after the fellowship began. (Dep., pp. 23-24, 62.) Dr. Hamid explained that the problems were tied to the arrival of Dr. Alghamdi's wife and children from Saudi Arabia to the United States as well as the wife's pregnancy, as Dr. Alghamdi increasingly had to spend time going to medical appointments with his wife and driving his children to and from school, and according to Dr. Hamid these family commitments increasingly interfered with the amount of time Dr. Alghamdi could commit to his clinical training at CHBC. (Dep., pp. 23-24.)

{¶12} As Dr. Hamid testified, despite his concerns about Dr. Alghamdi's time commitments, he and CHBC renewed the agreement with SACM upon the conclusion of the first year of the fellowship, and in conjunction with renewing the agreement he negotiated an increase in compensation for the second year of the fellowship. (Dep., p. 28.) Under the terms of the agreement, Dr. Hamid testified, he was supposed to submit an annual progress report to SACM before the agreement would come up for renewal. (Dep., pp. 34-35.) According to Dr. Hamid, when the time came to submit a progress report for the second year of the fellowship, he had a series of conversations

with Dr. Alghamdi in which he recommended that Dr. Alghamdi either conclude the fellowship after the second year, or, if he desired to complete the third year, have his wife and children return to Saudi Arabia so that he could devote more time to the fellowship. (Dep., pp. 58, 111.) For his part, Dr. Hamid stated that he wanted to end the fellowship after the second year due to his concerns about Dr. Alghamdi's time commitments. (Dep., p. 89.) Dr. Hamid testified that he informally mentioned his concerns to someone at SACM and was told that if he expressed such concerns in the progress report it would result in SACM withdrawing its support of Dr. Alghamdi and he would have to return to Saudi Arabia. (Dep., p. 60.)

{¶13} Dr. Hamid related that on March 3, 2014, in conjunction with Drs. Jeff Wenstrup and Alexander Galazyuk from NEOMED, he submitted the second-year progress report to SACM, raising no concern about Dr. Alghamdi's time commitments. (Dep. Exhibit C.) Dr. Hamid stated that he subsequently began negotiating with SACM on terms for renewing the agreement for a third year, proposing another increase in compensation for himself and CHBC. (Dep., pp. 50-51.)

{¶14} However, Dr. Hamid stated that Dr. Alghamdi stopped showing up at CHBC and on March 19, 2014, Dr. Alghamdi sent an email voicing concerns about the quality and value of the training that he had been receiving at CHBC. (Dep., p. 63.) Dr. Hamid also testified that he and CHBC received a March 24, 2014 letter from an attorney retained by Dr. Alghamdi. (Dep., pp. 76-77.) In this letter, concerns were raised that the quality of training being provided to Dr. Alghamdi at CHBC was not what it had been represented to be nor worth the money that CHBC and Dr. Hamid were receiving, that Dr. Alghamdi would not authorize any more funds to be paid by SACM to CHBC and Dr. Hamid, that Dr. Alghamdi was determined to complete the third year of his fellowship at NEOMED, and that Dr. Alghamdi sought a final certification from CHBC and Dr. Hamid as to the completion of their clinical portion of the program. (Dep., pp. 76-77.)

{¶15} Dr. Hamid testified that on March 24, 2014, he informed Dr. Wenstrup via email that he could no longer provide Dr. Alghamdi's clinical training and would terminate the fellowship. (Dep., p. 86.) Dr. Hamid also testified that one day later he emailed Drs. Wenstrup and Galazyuk a document in which he "expanded" upon the progress report the three of them had sent to SACM earlier that month, setting forth various criticisms of Dr. Alghamdi, and he asked for them to approve it for submission to SACM, but they declined to do so on the grounds that in their view Dr. Alghamdi's performance in the NEOMED portion of his fellowship was satisfactory and had been accurately portrayed in the progress report. (Dep., pp. 92, 96.)

{¶16} Despite failing to obtain the approval of Drs. Wenstrup and Galazyuk, Dr. Hamid stated that on April 28, 2014, he went ahead and emailed the document with his criticisms of Dr. Alghamdi to SACM, knowing that once SACM became aware of his concerns SACM would terminate the fellowship. (Dep., p. 94.) Dr. Hamid related that in both this message and in later correspondence, including a May 3, 2014 email to SACM, he offered two outcomes, being that he would either deem Dr. Alghamdi to have "failed" the fellowship, or, in the alternative, if certain demands were met he would provide a certificate of completion as had been requested by Dr. Alghamdi's attorney, and later by SACM. (Dep., pp. 85, 103-105, 117-119.) Dr. Hamid testified that the demands he identified for providing the certificate of completion were as follows: (1) that Dr. Alghamdi apologize in person at CHBC and provide a written retraction of his March 19, 2014 email, (2) that Dr. Alghamdi successfully complete a brain-mind-body course at NEOMED, (3) that Dr. Alghamdi perform a three-month clinical rotation somewhere other than CHBC with any previous CHBC fellow by the end of 2014, and (4) that SACM pay half the compensation that he and CHBC would have received for the third year of the fellowship. (Dep., pp. 72-74.)

{¶17} Dr. Hamid stated that SACM and Dr. Alghamdi did not accept the terms of his proposal and he consequently deemed Dr. Alghamdi to have failed the fellowship

rather than issue the certificate of completion. (Dep., pp. 113-114.) The following month, in June 2014, Dr. Hamid retired from practice and dissolved CHBC due to his own medical issues, he testified. (Dep., pp. 153-154.)

{¶18} When asked how it was that NEOMED interfered with his and CHBC's relationship with SACM, Dr. Hamid testified that he faulted NEOMED for taking what he considered to be a "passive position" when the problems arose, and he also felt that any direct communications NEOMED may have had with SACM or Dr. Alghamdi that excluded him would have been inappropriate as well. (Dep., p. 134.) Dr. Hamid admitted that he does not know whether any such communications actually occurred. (Dep., pp. 115, 128, 157-158.) Dr. Hamid also testified that he believes Dr. Alghamdi wanted to leave CHBC because the clinical demands were simply too great for his schedule and he therefore sought to spend the third year of the fellowship elsewhere, and Dr. Hamid believes that Dr. Alghamdi may have worked with SACM toward that goal. (Dep., pp. 93, 95, 112, 144.)

{¶19} Dr. Wenstrup, in his affidavit, avers in part that "NEOMED had no involvement with Dr. Alghamdi's decision to terminate his fellowship with [CHBC and Dr. Hamid]." (Affidavit, ¶ 12.) Rather, Dr. Wenstrup states that at some point in March 2014 Dr. Alghamdi notified NEOMED that he was terminating his fellowship with CHBC and Dr. Hamid and that he wished to complete the remainder of his fellowship at NEOMED. (Affidavit, ¶ 6.) And, as Dr. Wenstrup states, the March 24, 2014 letter in which Dr. Alghamdi's attorney notified CHBC and Dr. Hamid that Dr. Alghamdi was terminating the fellowship was also copied to NEOMED. (Affidavit, ¶ 6.)

{¶20} Dr. Wenstrup also states that NEOMED was informed by Dr. Hamid that he and CHBC were ending their involvement in the fellowship when Dr. Hamid sent NEOMED the critical report about Dr. Alghamdi, which he avers NEOMED would not sign off on because Dr. Alghamdi performed well in the NEOMED portion of his fellowship. (Affidavit, ¶ 5.) Additionally, Dr. Wenstrup states that NEOMED was

informed again in subsequent correspondence by Dr. Hamid on April 28 and May 3, 2014, that he and CHBC were terminating the fellowship, and on or about May 5, 2014, NEOMED received notice that SACM suspended the third year of the fellowship. (Affidavit, ¶ 7.)

{¶21} Dr. Wenstrup goes on to aver, in part:

{¶22} "8.      Meanwhile, NEOMED, through its affiliation with Kent State University, was the sponsor of Dr. Alghamdi's J-1 educational visa.  Attached as Ex. O-1 is a true and accurate copy of Dr. Alghamdi's visa documents.  Unless Dr. Alghamdi continued his training, he would be sent home to Saudi Arabia without completing the third and final year of his fellowship.

{¶23} "9.      Pursuant to the terms of its agreement with CHBC, on May 7, 2014, NEOMED provided CHBC with 60-day notice of termination of the subcontractor agreement.  A true and accurate copy of NEOMED's Notice of Termination is attached as Ex. L to Dr. Hamid's deposition transcript.

{¶24} "10.     On May 9, 2014, NEOMED, as Dr. Alghamdi's visa sponsor, agreed to expand NEOMED's role in the third year of his fellowship.  NEOMED agreed to expand its role so that Dr. Alghamdi could complete his fellowship before returning to Saudi Arabia.  NEOMED agreed to this expanded role only after being notified that Dr. Alghamdi intended to terminate the third year of his fellowship with Plaintiffs, that Plaintiffs intended to terminate early the third year of Dr. Alghamdi's fellowship at CHBC, and that SACM suspended the third year of Dr. Alghamdi's fellowship with CHBC.  Attached as Ex. O-2 is a true and accurate copy of NEOMED's May 9, 2014 offer to SACM to complete Dr. Alghamdi's training.

{¶25} "11.     NEOMED did not interfere with Plaintiff's business relationship with SACM in any way, nor did it purposely cause or induce SACM or Dr. Alghamdi to end their relationship with Plaintiffs."

{¶26} From the evidence submitted in relation to the motion for summary judgment, there can be no doubt that it was Dr. Alghamdi who effectively terminated the fellowship with CHBC and Dr. Hamid.  It is undisputed that Dr. Alghamdi sent Dr. Hamid an email on March 19, 2014, raising serious concerns about the quality of training provided by Dr. Hamid and CHBC.  Dr. Wenstrup's affidavit shows that Dr. Alghamdi notified NEOMED that month that he was terminating the fellowship with CHBC and Dr. Hamid.  Furthermore, the March 24, 2014 letter from Dr. Alghamdi's attorney notified Dr. Hamid and CHBC that Dr. Alghamdi would not authorize SACM to provide any more funds to CHBC and Dr. Hamid.  As Dr. Hamid admitted in his deposition (Dep., p. 51), the funds for Dr. Alghamdi's training were ultimately from the hospital that employed Dr. Alghamdi in Saudi Arabia, not SACM, and the letter from Dr. Alghamdi's attorney affirmatively stated that Dr. Alghamdi would not give his authorization for any more of those funds to be paid to CHBC and Dr. Hamid.

{¶27} Dr. Wenstrup avers that NEOMED had no involvement in Dr. Alghamdi's decision to terminate his training with Dr. Hamid and CHBC.  (Affidavit, ¶ 12.)  Dr. Hamid stated that he has "no idea" whether NEOMED had anything to do with Dr. Alghamdi's decision, and that he does not believe NEOMED desired for him and CHBC to not succeed.  (Dep., pp. 138, 147.)  There is no evidence to controvert Dr. Wenstrup's assertion and demonstrate that Dr. Alghamdi's decision resulted from some intentional interference by NEOMED.

{¶28} Not only is there a paucity of evidence that NEOMED caused Dr. Alghamdi to make that decision, there is evidence that Dr. Alghamdi's decision was influenced by wholly separate factors.  The reasoning cited by Dr. Alghamdi in his March 19, 2014 email and by his attorney in the March 24, 2014 letter was that he felt he was not receiving a quality education at CHBC, that he was not getting the training from CHBC that had been promised, and that the escalating financial costs for him to participate in the program exceeded the value that he derived from the program.  Moreover,

Dr. Hamid testified that he had his own serious concerns about Dr. Alghamdi which made him want to end the program once the second year concluded, and that he previously advised Dr. Alghamdi to end the fellowship after two years because he did not think Dr. Alghamdi could devote the necessary amount of time to complete the third year, and he himself had hoped to end the fellowship after the second year for that reason. The evidence shows that Dr. Hamid and Dr. Alghamdi each had their stated reasons for wanting to terminate the fellowship as it existed, and those reasons in no way show any tortious interference on the part of NEOMED.

{¶29} On top of Dr. Alghamdi's decision to terminate the fellowship, it is undisputed that Dr. Hamid expressed multiple times that he was terminating the fellowship, and he also understood, as someone at SACM explained to him previously, that his submission of the critical report about Dr. Alghamdi would bring an end to the fellowship. Dr. Hamid also acknowledged that under the proposal he made to SACM for resolving the matter, there was no scenario in which he and CHBC would continue to have a part in the fellowship. (Dep., pp. 77, 141-142.) Although all of this occurred after Dr. Alghamdi's decision to terminate the fellowship, even if these actions by Dr. Hamid could be construed as having a causative effect upon the termination of the fellowship, in no way does the evidence show that they resulted from any intentional interference by NEOMED.

{¶30} Although NEOMED eventually made an offer to SACM to provide the third year of Dr. Alghamdi's fellowship, this occurred after (1) Dr. Alghamdi's decision to terminate the fellowship, (2) repeated statements by Dr. Hamid that he and CHBC were also terminating the fellowship, and (3) Dr. Hamid's submission of the critical report to SACM, which as he knew would result in SACM not renewing its agreement with him. These circumstances do not permit the conclusion that NEOMED's offer was an intentional act of interference that caused the termination of the business relationship surrounding the fellowship. The only reasonable conclusion to be drawn is that the

business relationship surrounding the fellowship had already terminated before NEOMED made its offer to Dr. Alghamdi and SACM.

{¶31} Dr. Hamid and CHBC argue that NEOMED must have been communicating with Dr. Alghamdi or his attorney leading up to the offer that NEOMED made to Dr. Alghamdi and SACM, and they argue that some of the correspondence between the various parties is suggestive of such conversations taking place without the involvement of CHBC and Dr. Hamid, which they contend is evidence of tortious interference. As previously stated, however, on or before March 24, 2014, several weeks before NEOMED's offer to Dr. Alghamdi and SACM, Dr. Alghamdi decided to terminate his fellowship with CHBC and Dr. Hamid, and later on March 24, 2014, Dr. Hamid notified NEOMED via Dr. Wenstrup that he and CHBC also regarded their participation in the fellowship as having terminated, and there is no evidence to conclude that some act of intentional interference by NEOMED caused the relationship to end. NEOMED, having already been notified that the relationship between Dr. Alghamdi and CHBC and Dr. Hamid was ending, cannot be found to have tortiously interfered with that relationship by then communicating with Dr. Alghamdi and his sponsor organization, SACM, to arrange to provide the final year of training for Dr. Alghamdi, whose educational visa was sponsored by NEOMED, and who would be forced to leave the United States and not attain the education that NEOMED facilitated in the first place by sponsoring his visa.

{¶32} The only reasonable conclusion that can be drawn is that there was no intentional interference on the part of NEOMED causing a breach or termination of the relationship between CHBC, Dr. Hamid, and SACM. Because it has been demonstrated that CHBC and Dr. Hamid cannot establish this element of their claim for tortious interference with a business relationship, the court need not reach NEOMED's additional argument that CHBC and Dr. Hamid cannot establish damages. Accordingly,

the motion for summary judgment shall be granted as to the claim of tortious interference with a business relationship.

{¶33} Next, the court shall address the claim for breach of contract. "To prevail on a breach of contract claim, a plaintiff must prove the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Prince v. Kent State Univ.*, 10th Dist. Franklin No. 11AP-493, 2012-Ohio-1016, ¶ 24. "Contracts should be interpreted so as to carry out the intent of the parties, which is evidenced by the contractual language." *Sys. Automation Corp. v. Ohio Dept. of Admin. Servs.*, 10th Dist. Franklin No. 04AP-97, 2004-Ohio-5544, ¶ 26.

{¶34} "'[T]here is an implied duty of good faith and fair dealing in every contract.'" *Pertoria, Inc. v. Bowling Green State Univ.*, 10th Dist. Franklin Nos. 13AP-1033 & 14AP-63, 2014-Ohio-3793, ¶ 22, quoting *Am. Contr's. Indemn. Co. v. Nicole Gas Prod., Ltd.*, 10th Dist. Franklin No. 07AP-1039, 2008-Ohio-5056, ¶ 13. "'"Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party."'" *PHH Mtge. Corp. v. Ramsey*, 10th Dist. Franklin Nos. 13AP-925 & 14AP-129, 2014-Ohio-3519, ¶ 33, quoting *Littlejohn v. Parrish*, 163 Ohio App.3d 456, 2005-Ohio-4850, ¶ 21 (1st Dist.), quoting Restatement of the Law 2d, Contracts, Section 205, Comment d (1981). "'Good faith is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.'" *Ed Schory & Sons v. Francis*, 75 Ohio St.3d 433, 444-445 (1996), quoting *Kham & Nates Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357-1358 (7th Cir.1990).

{¶35} Similar to the allegations of tortious interference, CHBC and Dr. Hamid argue that NEOMED exercised bad faith by communicating with and arranging for Dr. Alghamdi to finish his fellowship at NEOMED rather than working with CHBC and Dr. Hamid to resolve the problems "so the fellowship could conclude as contracted

* * *."  CHBC and Dr. Hamid argue that "[t]he parties were working together to provide a fellowship training for Dr. Alghamdi" and that CHBC had a "duty to broker a resolution".

{¶36} The assertion that NEOMED had a duty to try to resolve the issues between Dr. Hamid and Dr. Alghamdi "so the fellowship could conclude as contracted" is incompatible with the fact that Dr. Hamid flatly informed NEOMED that he could not continue to train Dr. Alghamdi.  Indeed, Dr. Hamid resolved to not even communicate with Dr. Alghamdi.  (Dep., p. 78.)  By no later than March 24, 2014, it was clear that the fellowship could not conclude as originally intended because Dr. Alghamdi did not wish to receive from CHBC and Dr. Hamid, nor would CHBC and Dr. Hamid provide, a third year of fellowship training.  Further, the terms of the subcontracting agreement in no way reflect that CHBC or Dr. Hamid had a justified expectation that, after it was determined that they would no longer provide Dr. Alghamdi's third year of the fellowship, NEOMED would step in and try to negotiate the terms of their exit.  In fact, Dr. Hamid admitted in his deposition that while he would have "preferred" for NEOMED to try to step in and broker a comprehensive resolution as to all parties, the subcontracting agreement did not require that.  (Dep., pp. 120-121.)

{¶37} Regarding Dr. Hamid's request to Dr. Wenstrup and another faculty member at NEOMED to join in a critical report about Dr. Alghamdi to be sent to SACM, the uncontested averments from Dr. Wenstrup show that from NEOMED's perspective no such criticisms were justified relative to Dr. Alghamdi's training there.  The fact that NEOMED did not give support to Dr. Hamid in that regard cannot be viewed as bad faith.

{¶38} At its core, the common purpose shared by all those involved at the outset of the fellowship was to educate and train Dr. Alghamdi.  From the beginning, NEOMED worked toward that common purpose, both in sponsoring Dr. Alghamdi's educational visa and in providing him education and training.  Once it was determined that Dr. Alghamdi would not be completing the fellowship with CHBC and Dr. Hamid,

unattended by any bad faith or tortious interference by NEOMED, the evidence shows that NEOMED remained faithful to the original common purpose by offering to continue providing education and training to Dr. Alghamdi and to expand its role to include the clinical component that CHBC and Dr. Hamid would no longer provide. Given the collapse of the relationship between Dr. Alghamdi, CHBC and Dr. Hamid, it is undisputed that Dr. Alghamdi faced the prospect of having to leave the United States without completing the educational fellowship. For NEOMED, having responsibility both for Dr. Alghamdi's educational visa and for a component of his fellowship training, to have carried on with the original purpose of the arrangement was consistent with the expectations created by the underlying agreement. Neither the underlying agreement nor the subcontracting agreement created an expectation that, if Dr. Alghamdi were unable to complete his third year at CHBC, Dr. Alghamdi would be precluded from finishing the balance of his training at NEOMED.

{¶39} It also cannot be reasonably construed as taking opportunistic advantage for NEOMED to have had communications with Dr. Alghamdi to which Dr. Hamid and CHBC were not privy. Again, NEOMED was Dr. Alghamdi's educational visa sponsor and furnished a component of his fellowship training. The subcontracting agreement cannot be understood to give rise to any expectation that NEOMED would not communicate with its own student, Dr. Alghamdi, unless it included CHBC and Dr. Hamid, much less that NEOMED could not have such communications when it was on notice that CHBC and Dr. Hamid would no longer be training Dr. Alghamdi.

{¶40} When asked in his deposition how he considered NEOMED to have acted in bad faith, one basis Dr. Hamid identified was that he had a desire to work more closely with NEOMED and do some teaching there in the future, but he did not get an opportunity to pursue those endeavors. (Dep., pp. 136-137.) As Dr. Hamid admitted, however, the subcontracting agreement did not provide for these things. (Dep., p. 138.) A review of the terms set forth in the subcontracting agreement clearly demonstrates

that Dr. Hamid had no expectation thereunder to teach at NEOMED. "What the duty of good faith consists of depends upon the language of the contract in each case which leads to an evaluation of reasonable expectations of the parties." *Fultz & Thatcher v. Burrows Group Corp.*, 12th Dist. Warren No. CA2005-11-126, 2006-Ohio-7041, ¶ 34. Under Ohio law, the duty of good faith "'describes how a party is to perform its contractual obligations, i.e., it does not establish a duty independent of the contract.'" *Wells Fargo Bank, N.A. v. Fifth Third Bank*, 931 F.Supp.2d 834, 840 (S.D.Ohio 2013), quoting *Tarquinio v. Equity Trust Co.*, 9th Dist. Lorain No. 06CA008913, 2007-Ohio-3305, ¶ 14. Dr. Hamid's inability to pursue any teaching opportunity that he sought at NEOMED is a matter independent of the parties' subcontracting agreement and does not demonstrate an entitlement to relief under the theory that NEOMED breached the implied duty of good faith relative to the subcontracting agreement.

{¶41} Another reason identified by Dr. Hamid in his deposition for why he considered NEOMED to have acted in bad faith was that during the formulation of the subcontracting agreement, NEOMED sought to have the agreement drafted by an attorney. (Dep., p. 135.) While Dr. Hamid may have preferred to keep his relationship with NEOMED less formal and to not involve lawyers in formulating an agreement, the mere fact that NEOMED sought the assistance of legal counsel to formulate or review the agreement cannot reasonably be seen an act of bad faith.

{¶42} Lastly, as a matter of law it cannot be considered an act of bad faith for NEOMED to have terminated the subcontracting agreement with CHBC and Dr. Hamid because, as acknowledged by Dr. Hamid (Dep., pp. 34, 120.), the terms of that agreement expressly gave NEOMED the right to do so. *See U.S. Bank Natl. Assn. v. Mobile Assocs. Natl. Network Sys.*, 195 Ohio App.3d 699, 2011-Ohio-5284, ¶ 32 (10th Dist.).

{¶43} The only reasonable conclusion that can be drawn is that NEOMED did not breach the implied duty of good faith in the parties' subcontracting agreement.

Accordingly, the motion for summary judgment shall be granted as to CHBC and Dr. Hamid's claim for both breach of contract, as well as the ancillary claim for declaratory relief, which seeks a determination that NEOMED breached the duty of good faith.

{¶44} Finally, it is noted that counsel for plaintiffs submitted a "declaration" concurrent with the filing of plaintiffs' response to the motion for summary judgment in which counsel for plaintiffs states, in part, that Dr. Hamid has been out of the country and he was therefore unable to obtain an affidavit from Dr. Hamid "to present the facts needed to justify the Plaintiffs' defense to the defendant's motion for summary judgment." This document is not styled as a motion, but even if the intention in filing it was to move for another continuance, it does not demonstrate sufficient reasons to warrant another continuance. There is no suggestion as to what additional facts Dr. Hamid could provide by affidavit that would justify plaintiffs' opposition to the motion for summary judgment. *See State ex rel. Sinchak v. Chardon Local School Dist.*, 11th Dist. Geauga No. 2012-G-3078, 2013-Ohio-1098, ¶ 35.

{¶45} In addition, Civ.R. 56(F) states:

{¶46} "Should it appear from the *affidavits* of a party opposing the motion for summary judgment that the party cannot for sufficient reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or discovery to be had or may make such other order as is just." (Emphasis added.)

{¶47} Rather than submitting an affidavit in accordance with Civ.R. 56(F), counsel for plaintiffs submitted an unnotarized declaration pursuant to 28 U.S.C. 1746. In federal proceedings 28 U.S.C. 1746 authorizes declarations under penalty of perjury that are not sworn before a notary, but "Ohio has never recognized that these unsworn declarations may serve as a substitute for a valid affidavit." *Disciplinary Counsel v. Squire*, 130 Ohio St.3d 368, 2011-Ohio-5578, ¶ 45, fn. 3.

{¶48} Accordingly, the declaration of counsel for plaintiffs does not warrant a continuance under Civ.R. 56(F).

{¶49} Based upon the foregoing, the court concludes that there are no genuine issues of material fact and that defendant is entitled to judgment as a matter of law.  As a result, defendant's motion for summary judgment shall be granted and judgment shall be rendered in favor of defendant.

_____
PATRICK M. MCGRATH
Judge

[Cite as *Cleveland Hearing & Balance Ctr., Inc. v. N.E. Ohio Med. Univ.*, 2017-Ohio-2699.]

| | |
|---|---|
| CLEVELAND HEARING AND BALANCE CENTER, INC., et al. | Case No. 2016-00102 |
| Plaintiffs | Judge Patrick M. McGrath<br>Magistrate Robert Van Schoyck |
| v. | JUDGMENT ENTRY |
| NORTHEAST OHIO MEDICAL UNIVERSITY | |
| Defendant | |

{¶50} A non-oral hearing was conducted in this case upon defendant's motion for summary judgment. For the reasons set forth in the decision filed concurrently herewith, defendant's motion for summary judgment is GRANTED and judgment is rendered in favor of defendant. All previously scheduled events are VACATED. Court costs are assessed against plaintiffs. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
PATRICK M. MCGRATH
Judge

cc:

Jonathan P. Blakely
P.O. Box 217
Middlefield, Ohio 44062

Stacy L. Hannan
Velda K. Hofacker
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

**Filed April 5, 2017**
**Sent to S.C. Reporter 5/5/17**